**UNITED STATES of America, Appellee,**

v.

**Arif DURRANI, Defendant–Appellant.**

**No. 395, Docket 87–1256.**

United States Court of Appeals, Second Circuit.

Argued Nov. 5, 1987.

Decided Dec. 3, 1987.

Holly B. Fitzsimmons, Asst. U.S. Atty., District of Connecticut, Bridgeport, Conn., (Stanley A. Twardy, Jr., U.S. Atty.), New Haven, Conn., for appellee.

Alan M. Dershowitz, Cambridge, Mass. (Nathan Z. Dershowitz, Victoria B. Eiger, Dershowitz & Eiger, P.C., New York City, on the brief, Jane Simkin Smith, of counsel), for defendant-appellant.

Before KAUFMAN, PIERCE and MINER, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

The still simmering national scandal of high government officials engaged in the covert shipment of arms to Iran has brought to the fore intriguing questions in our criminal law. The defendant here, Arif Durrani, accused of shipping Hawk missile parts to Iran without a license, seeks refuge under the aegis of official authority. Durrani candidly admits that he sold arms to Iran, but claims to have been a cog in the wheel turned by Lt. Colonel Oliver North and Vice Admiral John Poindexter.

Durrani appeals from a judgment of conviction entered on May 13, 1987 by Chief Judge Daly of the United States District Court for the District of Connecticut. On April 2, 1987, a jury found Durrani guilty on three counts of violating the Arms Export Control Act, 22 U.S.C. § 2778(c) (1982), for: 1) exporting arms without a license on August 30, 1986; 2) attempting to export arms without a license on October 3, 1986; and 3) failing to register as an arms exporter with the State Department's Office of Munitions Control. He received an aggregate sentence of 10 years imprisonment and was fined $3 million.

## BACKGROUND

In early May 1986, Durrani embarked upon a series of elusive dealings with Radio Research Instrument, Inc., a supplier of surplus radar equipment headquartered in Danbury, Connecticut. Specifically, Durrani supplied Edmund Doyle, a Radio Research vice president, with a list of Hawk missile parts [1] that he hoped to purchase for export to Jordan.

By July, Durrani had placed a down payment on those parts that Radio Research could obtain for him. Unknown to Durrani, however, Radio Research harbored suspicions about his activities and notified the United States Customs Service. The Customs Service, in turn, placed Durrani under close surveillance, recording his numerous phone conversations with Doyle and videotaping his visits to the company.

On August 11th and 12th, Durrani sent Radio Research four purchase orders, requesting Hawk missile parts valued at $347,000. He instructed that the parts be labeled "RJAF, Amman, Jordan." Upon Doyle's request, Durrani captioned the purchase orders "State Department license will be obtained by the end user/buyer and will be their responsibility." Despite this written commitment, however, Durrani still had not produced the necessary licenses when, two weeks later, the first shipment was ready for delivery.

On August 22nd, Durrani visited Radio Research to press for release of the goods. But Doyle adamantly refused to ship them without first seeing the export licenses. To resolve this impasse, Durrani took personal responsibility for obtaining the licenses and offered to sign any document Doyle wished attesting to his obligation. In addition, he offered to show Doyle the original purchase orders issued by the Jordanian government and a copy of a so-called "master license" that authorized the transaction. When Doyle expressed concern that this would be an irregular procedure, Durrani insisted that the transaction was "101 percent clean" because "I do everything by the book. I know exactly what is what and what has to be done." In a compromise,

---

1. The Hawk missile system is a ground-based anti-aircraft system of immense ability. A typical firing section consists of three to four underground launchers, each of which contains three conventional missiles. The system is operated from three vans: an "information control center," a "platoon command post," and a "battery control center." Four radars track incoming planes and aim the missiles.

Doyle agreed to release the parts only if Durrani certified in writing that he was responsible for obtaining the export licenses.

The following day, Durrani arranged for Doyle to telefax a license certification form directly to Jet Stream Freight Services, a New York freight forwarder Durrani had hired to handle the shipment of the missile parts. Two Jet Stream employees, Henk Spreeuwenberg and Mohammed Moosa, met Durrani and Manuel Pires, an international arms merchant, at Kennedy Airport on August 26th. In their presence, Durrani signed the following statement:

> The export of Hawk Missile parts being sold to you by Radio Research require a U.S. State Department Export License prior to their export. I certify that the appropriate State Department export licenses will be obtained prior to the exportation of Hawk Missile Parts from the U.S.

He also verbally assured Spreeuwenberg that he would resolve any licensing difficulties, and alluded to "orders from Washington." Finally, Durrani produced a document which Moosa erroneously took to be an export license.

Upon receiving the signed statement and payment of the outstanding balance due on the parts, Doyle released the goods for delivery to Jet Stream. Before shipment, however, at Durrani's express instruction, Jet Stream employees obliterated the markings on the packing crates, and redirected them to Comexas Airfreight Division in Zaventem, Belgium. The shipment was accompanied by a false invoice from CAD Transportation, an instrumentality of Durrani's, to KRAM, Ltd., a Belgian company controlled by Pires. Moreover, the invoice valued the goods at under $500, rather than the $347,000 Durrani had paid for them. This permitted Durrani not to file a "Shippers Export Declaration" with the Customs Service, as required for shipments in excess of $1000. The shipment was placed on a People Express flight to Brussels, Belgium on August 30th.

Throughout September, Durrani remained in close contact with Doyle, making frequent inquiries about the price and availability of various equipment. They discussed delivery of the remaining items from Durrani's first order and the possibility of additional orders being placed. On October 1st, Durrani telephoned Doyle from London, and arranged for a second shipment of Hawk parts.

Two days later, Durrani visited Radio Research to inspect the goods before they were shipped. As he did in August, Durrani signed a statement acknowledging responsibility for obtaining the required export licenses, marked the crates for delivery to Jordan, and instructed that they be forwarded to Jet Stream for transshipment. This shipment, however, never left Radio Research. Durrani was arrested as he left the company, and the crates were seized.

Shortly thereafter, a woman identifying herself as "Mrs. Durrani" called Jet Stream and ordered that the shipment be diverted to California instead of sent to Jordan. She also requested that Jet Stream destroy all files relating to Durrani and that they deny knowledge of him or his activities. Somewhat later, Durrani himself called with similar instructions. When Spreeuwenberg informed him that Customs agents already had seized the files, Durrani responded, "I have a lot of troubles."

On October 8, 1986, Durrani was indicted for the August 30th shipment. Within a month, the first allegations of covert arms sales rocked the nation. On November 14th, he moved to dismiss the charges against him, claiming that the government was selectively prosecuting violators of the licensing provision. Durrani, however, took no action with respect to his dismissal motion until February 4, 1987, when he filed an affidavit in support of the motion. The same day, Durrani moved to disqualify Chief Judge Daly from further consideration of his case, alleging the judge was prejudiced against him. On February 18th, a superseding indictment was returned based on the October 3rd shipment and Durrani's failure to register with the State Department's Office of Munitions Control. A week later, on February 24th, Judge

Daly denied Durrani's disqualification motion, finding no impropriety.

On February 27th, with jury selection scheduled to begin on March 3rd, appellant served the Director of the Central Intelligence Agency (CIA) with a subpoena *duces tecum* returnable on March 4th. He sought a broad range of documents including all those connecting him to arms exports and all those relating to CIA involvement in Iranian arms sales from 1982 to 1987. Similar subpoenas were served on the National Security Council (NSC) and the State Department on March 2nd. The government moved to quash the subpoenas. Hearings on the motion to quash were held on March 9th and 10th; on March 11th, the trial judge made a preliminary ruling quashing the subpoenas. The trial began on March 16th.

### THE TRIAL

We summarize here those aspects of the trial that resulted in issues raised on appeal.

#### The Government's Case

Durrani was charged with violating the Arms Export Control Act, 22 U.S.C. § 2778 (1979), and the accompanying International Traffic in Arms Regulations, 22 C.F.R. § 120 *et seq.* (1987), which require the licensing of all defense material before export. Under the Act, the State Department's Office of Munitions Control compiles the United States Munitions List and issues export licenses for goods and services contained on it.

To demonstrate that the exported items appeared on the Munitions List, and thus fell within the purview of the Act, the government introduced the testimonies of Billy Boland, an electronic technician equipment specialist at the Hawk project office, U.S. Missile Command, Redstone Arsenal, and Brenda Carnahan, from the Office of Munitions Control.

Boland, an expert on Hawk missiles, testified without objection. He stated that several of the items sent to Brussels on August 29th were "specifically designed" for the Hawk system, that one was "specifically used" in the Hawk system, and that another, a relay switch, was a repair part commonly but not exclusively used in the Hawk system. He added that each of the parts from the aborted October 3 shipment were "specifically designed" for the Hawk missile. On cross-examination, however, Boland conceded he did not know whether the parts could be used for purposes unrelated to the Hawk system.

Carnahan followed Boland to the stand, and testified that the Office of Munitions Control had placed various Hawk parts on the Munitions List. She identified the parts at issue here as among those included on the list, although on cross-examination, she conceded that her testimony was predicated on a telephone conversation with officials at Redstone Arsenal. Carnahan also outlined the procedure for determining whether an item one contemplates exporting appears on the list. Carnahan read into evidence a letter from the director of the Office of Munitions Control, who denied the existence of "any registration application by, any application for export license by, or any export license issued to" Durrani, his corporate alter egos or his alleged associates, regarding the Hawk missile parts purchased from Radio Research.

#### Durrani's Defense

During the months immediately preceding trial, the now infamous Iran-contra scandal gained national prominence. Allegations of covert U.S. government arms sales to Iran became widespread, following revelations in a Beirut newspaper that high ranking American officials had held secret negotiations with their Iranian counterparts regarding American hostages held in Lebanon by Iranian sympathizers. NSC staff member Lt. Col. Oliver North, retired Air Force General Richard Secord and Secord's business partner Albert Hakim were identified as participants in the operation.[2]

**2.** *See The Iran–Contra Investigation: Joint Hearings Before the House Select Committee to Investigate Covert Arms Transactions with Iran and the Senate Select Committee on Secret Military*

Durrani contends that his activities derived from this officially-sanctioned covert operation, and thus were exempt from any licensing requirements. This was not always his claim. Durrani's story regarding the ultimate destination of the goods changed drastically over time. To Doyle, he claimed that the parts were intended for Jordan. His counsel maintained this position when appealing the lower court's denial of bail. In fact, Durrani first pressed his claims of government involvement on the eve of trial in his February 4, 1987 affidavit in support of his motion to dismiss the indictment. Durrani then repeated these claims in his trial testimony, although the details of his testimony often diverged from those in his affidavit.

At the trial, Durrani chronicled his involvement in the shadowy world of Iranian arms sales. This involvement, he claimed, stemmed from a 1985 encounter with Rahim Malekzedeh, the procurement chief for the Iranian Revolutionary Guard. That autumn, Malekzedeh informed Durrani about Israeli arms shipments and American overtures to Iran. He also told Durrani that Iran was dealing with a number of Americans and Israelis, including North, CIA agent George Cave and Israeli official Amiram Nir. Durrani insists, however, that although Malekzedeh knew he sold arms internationally, they never discussed the possibility of Durrani selling arms to Iran.

While in Portugal in April 1986, Durrani allegedly met with George Hassan, a former high official of the Iranian secret service with ties to Israel. Hassan explained that he was working with Secord and Hakim on the American shipment of parts to Iran. Apparently, Hassan hoped Durrani would vouch for Secord and Hakim with Malekzedeh, and thus facilitate their sales to Iran. Durrani claims that Hassan established his credibility by showing him three

aircraft loaded with "Sidewinder" missiles at air bases in Lisbon. Also, an Israeli air force officer told Durrani that Pires was looking for Hawk parts. Since Hassan had told Durrani that Pires was supplying Secord, Durrani deduced that the United States was shipping goods to Iran through Pires.

After repeated attempts, Durrani finally arranged to meet Pires in Geneva on April 23rd. Pires was accompanied by his associate Willy de Greef and an Iranian official named Hussein. There, Durrani claims he consented to locate Hawk parts for the Iranians as a favor to Pires. The government presented rebuttal evidence that Pires paid Durrani in excess of $800,000 between June and October 1986. Durrani also claims he was told that, upon his return to the United States, he would be provided with a list of items to be procured. An individual named "Jack Koser" would meet him at National Airport in Washington, D.C., and provide this information. Only after he received the list, Durrani contends, did he contact Radio Research in an effort to locate the needed items.

Appellant argues that the parts list he was given matched the one the Iranians gave CIA agent Cave in Paris on March 7, 1986, thus demonstrating his involvement in a government-sponsored operation.[3] The government responds that the similarity reveals only that the Iranians were desperately seeking parts from any source in preparation for a September offensive.

By the end of August, Durrani's testimony continues, he came under substantial pressure from Pires and de Greef to expedite delivery of the desired parts. Because it was his understanding that Pires would obtain the export licenses, he consented to sign any statement Doyle wished at the August 26th airport meeting.

*Assistance to Iran and the Nicaraguan Opposition,* 100th Cong., 1st Sess. (1987) (co-chaired by Senator Daniel K. Inouye and Congressman Lee Hamilton).

**3.** Although all the evidence available to date indicates that the items were procured by the CIA from Department of Defense stockpiles, the extensive involvement of private intermediaries

in all stages of the covert operation makes it impossible to assert with absolute certainty that no private arms dealers furnished the U.S. government with the needed parts. *See Report of the Congressional Committees Investigating the Iran–Contra Affair,* H.R.Rep. No. 433, S.Rep. No. 216, 100th Cong., 1st Sess. 327–72 (1987).

In September, Pires summoned Durrani to Lisbon, where he met an unidentified "staff member of the NSC," who stressed the urgency of obtaining the parts and expressly related the parts to a deal to free American hostages in Lebanon. Durrani also described an alleged October 1st meeting in London with North, other unnamed American officials, and a representative of the Anglican Church. At this meeting, North assured him "not to worry about the paperwork," because President Reagan would shortly authorize arms shipments to Iran. That same day, Durrani called Doyle of Radio Research and made the final arrangements for the second shipment of Hawk parts.

Durrani returned from London on October 2nd, and proceeded on the following day to the headquarters of Radio Research to inspect the parts pending shipment. His arrest and the seizure of the parts ensued.

Durrani sought to support his contentions at trial by introducing evidence that private individuals participated in officially-sanctioned covert arms sales to Iran. Specifically, he proffered the *Report of the President's Special Review Board* [hereafter "Tower report"], the product of a blue-ribbon commission appointed by President Reagan in November 1986 to analyze the NSC's role in the operation, and two memoranda contained therein. The trial judge, however, found these documents hearsay, and refused to admit them into evidence. 659 F.Supp. 1183.

Durrani also sought a jury instruction that he should be acquitted if he reasonably believed he had official sanction for his actions and was therefore excused from obtaining licenses. The court gave this charge on counts 2 and 3, which stemmed from the October 3rd shipment, but not on the first count, which arose out of the August 30th shipment.

### The Government's Rebuttal Case

Two government witnesses challenged Durrani's account, disputing that North visited London at the time of their alleged meeting. Michael Sneddon of the NSC testified that the NSC's travel records failed to indicate that North was travelling at all in September 1986. Similarly, Adrian Owen of Her Majesty's Customs and Excise confirmed that his search of London hotel records disclosed no trace of North either under his own name or any known alias.

A third government witness challenged Durrani's entire story. Charles Moyer of the CIA testified that all parts procurements for North were handled by the CIA, not by private parties.

### DISCUSSION

Durrani raises numerous issues on appeal. First, he challenges the district court's decision not to charge the jury on one of two statutory exceptions to the license requirement of the Arms Export Control Act. Second, Durrani questions the judge's determination that the statutory exceptions constituted affirmative defenses rather than elements of the crime. Third, he contends that the judge erred in refusing to charge the jury, on the second count, that his "reasonable belief" he was working for the government should lead to his acquittal even if he failed to come within one of the exceptions. Fourth, he charges that both the jury instruction on the burden of persuasion for the license requirement and the prosecutor's summation unfairly shifted the burden of proof. Fifth, he challenges the lower court's exclusion of evidence intended to demonstrate private participation in the covert arms sales to Iran, namely portions of the Tower report and two North memoranda. Sixth, he asserts that the government's proof that the exported parts appeared on the Munitions List was inadmissible hearsay. Finally, he appeals the denial of his motion to disqualify the trial judge.

Appellant presents an interesting dilemma. Forced on the one hand to produce evidence of his connection with the Iran-contra scandal, but forbidden by the judge from presenting the first fruits of the investigation, appellant contends he was denied fundamental fairness. Nonetheless, we find Durrani's trial to have been fair,

and thus affirm his conviction on all counts.

### The Statutory Framework

■ The Arms Export Control Act, 22 U.S.C. § 2778 (1982), establishes a comprehensive framework for regulating transfers of defense-related goods and services. The President, authorized by the statute to control such exports, has delegated his power to the State Department's Office of Munitions Control. The State Department, in turn, registers arms exporters, compiles the United States Munitions List of articles covered by the Act, and considers applications to export those items from the United States.

**4.** 22 C.F.R. § 126.4 (1986) reads:

*Shipments by or for United States Government agencies.*

(a) A license is not required for the export of any defense article or technical data by or for any agency of the U.S. Government (1) for official use by such an agency, or (2) for carrying out any foreign assistance, cooperative or sales program subject to control by the President by other means. This exemption applies only when all aspects of a transaction (export, carriage, and delivery abroad) are effected by a United States Government agency, or when the export is covered by a United States Government Bill of Lading. This exemption, however, does not apply when a U.S. Government agency acts as a transmittal agent on behalf of a private individual or firm, either as a convenience or in satisfaction of security requirements. The approval of the Office of Munitions Control must be obtained before defense articles exported pursuant to this exemption are permanently transferred to a foreign person (e.g., property disposal of surplus defense articles overseas) unless (i) the transfer is pursuant to a sale, lease, or loan under the Arms Export Control Act or the Foreign Assistance Act of 1961, as amended, or (ii) the defense articles have been rendered useless for military purposes beyond the possibility of restoration.

(b) This section does not authorize any department or agency of the U.S. Government to make any export which is otherwise prohibited by virtue of other administrative provisions or by any statute.

(c) A license is not required for the export of any defense article or technical data for end-use by a U.S. Government Agency under the following circumstances:

(1) The export is pursuant to a contract with, or written direction by, an agency of the U.S. Government; and

(2) The end-user is a U.S. Government agency or facility, and the defense articles or

The export of arms requires a State Department license except in narrowly-defined circumstances detailed in the Act itself. No license is necessary for "... exports made by or for an agency of the United States Government (A) for official use by a department or agency of the United States Government, or (B) for carrying out any foreign assistance or sales program authorized by law and subject to the control of the President by other means." 22 U.S.C. § 2778(b)(2) (1982) [hereafter respectively the "official use" and "foreign assistance" exceptions.]

Illuminating these exemptions are the International Traffic in Arms Regulations (ITAR), 22 C.F.R. §§ 126.4, 126.6 (1986).[4]

technical data will not be transferred to any foreign person; and

(3) The urgency of the U.S. Government requirement is such that the appropriate export license or U.S. Government Bill of Lading could not have been obtained in a timely manner. A written statement certifying that these requirements have been met will be presented at the time of export to the appropriate district director of customs or Department of Defense transmittal authority, and shall be provided to the Office of Munitions Control.

22 C.F.R. § 126.6 (1986) reads:

*Foreign military aircraft and naval vessels, and the Foreign Military Sales program.*

(a) *General.* A license is not required for the export of any defense article if:

(1) The article was sold, leased, or loaned by the Department of Defense to a foreign country or international organization pursuant to the Arms Export Control Act or the Foreign Assistance Act of 1961, as amended, and

(2) The article was delivered to representatives of such a country or organization in the United States; and

(3) The article is to be exported from the United States on a military aircraft or naval vessel of that government or organization.

(b) *Foreign military aircraft and naval vessels.* A license is not required for the entry into the United States of military aircraft of any foreign state if no overhaul, repair, or modification of the aircraft is to be performed. Department of State approval for overflight (pursuant to the 49 U.S.C. 1508) and naval visits must, however, be obtained.

(c) *Procedures for the Foreign Military Sales program.—*

(1) *General.* District directors of customs are authorized to permit the export of unclassified defense articles, defense services, and technical data without a license if they were sold by the U.S. Department of Defense to

The regulations do not refer specifically to the statutory exceptions. Nonetheless, they substantially mirror the language found in the statute, and may provide guidance in interpreting the Act. As can be gleaned from a quick perusal of the regulations, the two sections are hardly so clear as a mountain lake in spring. In any event, section 126.4 expressly discusses the exemptions. It states that "[t]his exemption applies only when all aspects of a transaction (export, carriage, and delivery abroad) are effected by a United States Government agency, or when the export is covered by a United States Government Bill of Lading." Because we read this requirement to encompass both exceptions, there is serious doubt whether either exemption ever applies to a private individual like Durrani who has not obtained a government bill of lading. Judge Daly, however, charged on the "official use" exception, finding that only the "foreign assistance" provision was inapplicable as a matter of law.

### Foreign Assistance Exception

■ Appellant contends that the "foreign assistance" exemption is not only applicable to his case, but is, in fact, more appropriate than the "official use" provision. We reject this claim. Although the regulations are unclear, the only place where such sales are discussed is section 126.6, which in fact explicitly refers to the

Arms Export Control Act. That provision articulates rigorous standards for coming within the exemption. Specifically, it mandates that parts be sold to a foreign government representative in the United States and picked up by a foreign vessel. Unquestionably, Durrani cannot come within this interpretation of the exemption.

■ Section 126.6 might not be the only way to fall within the "foreign assistance" exception, but it is clearly indicative of the kinds of transactions for which the statutory exception was designed. Thus, the statutory language, by using a word like "programs" contemplates formalized dealings between official entities of the respective governments. Appellant has presented no basis for us to extend the "foreign assistance" exemption so far afield that it covers his case. The evidence at trial demonstrated that all transactions were conducted between private parties. Hawk parts were never delivered to any foreign government's representative in the United States, and they were exported commercially aboard a People Express airlines flight without the filing of any documents whatsoever. While Durrani claimed, during his negotiations with Radio Research, to be acting on behalf of the Jordanian government, he abandoned that posture after his arrest, and his testimony, as well as the government's evidence, was entirely to the contrary. A judge is required to charge on

---

foreign governments or international organizations under the Foreign Military Sales (FMS) program of the Arms Export Control Act. This procedure may be used only if a proposed export is:
(i) Pursuant to an executed U.S. Department of Defense Letter of Offer and Acceptance (DD Form 1513); and
(ii) Accompanied by a properly executed DSP–94; and
(iii) Made by the relevant foreign diplomatic mission of the purchasing country or its authorizing freight forwarder, provided that the freight forwarder is registered with the Office of Munitions Control pursuant to Part 122 of this subchapter.
 (2) *Filing of documents.*
(i) the original copy of completed Form DSP–94, together with one copy of the corresponding authenticated DD Form 1513 and a shipper's export declaration, must be filed with the District director of customs at the port of

exit prior to actual shipment. An executed DD Form 1513 is one which has been signed by (A) an authorized Department of Defense representative and countersigned by the Comptroller, Defense Security Assistance Agency (DSAA), and (B) by an authorized representative of the foreign government.
(ii) *SED.* The shipper's export declaration must be annotated as follows: "This shipment is being exported under the authority of Department of State Form DSP–94. It covers FMS Case (case identification), expiration date _____. 22 CFR 126.6 applicable."
(iii) *Notification to the Office of Munitions Control.* Copy number two of the completed Form DSP–94 should be removed by the exporter and sent immediately, together with a copy of the applicable authenticated DD Form 1513 and the Shipper's export declaration, to the Office of Munitions Control. Form DSP–94 shall be valid for two years from the date on which it is executed.

a defense theory only if the evidence provides some foundation for it. *United States v. Pedroza,* 750 F.2d 187, 205 (2d Cir.1984), *cert. denied,* — U.S. —, 107 S.Ct. 151, 93 L.Ed.2d 92 (1986). Thus we turn to an analysis of the applicability of the "official use" exception.

### Official Use Exception

■ The "official use" exemption appears to be somewhat broader than the "foreign assistance" section. The regulations are silent as to this exemption except when both are discussed. The government contends that section 126.4(c) spells out the requirements to come under the "official use" exception. The more persuasive reading is that this paragraph is unrelated to either exemption. In sum, the regulations provide no basis for interpreting the "official use" exception.

Substantial uncertainty thus remains whether this exception was applicable to Durrani's case. We need not resolve this question, however, because Judge Daly cautiously instructed the jury to consider this contention, reasoning that it remained conceivably within the ambit of Durrani's elastic story.

■ Appellant contends that the judge erred in this regard, however, because the exception should have been an element of the crime rather than an affirmative defense. The government maintains that the trial judge properly found the exception to be an affirmative defense. After a full consideration of the issues, we find the "official use" exception to be an affirmative defense. In reaching this conclusion, we have considered the text of the statute, its legislative history, the parties' relative abilities to present evidence on the issue and the structure of the statute generally.

■ An affirmative defense requires a defendant to produce "some evidence" placing the exception in issue; if he does so, the government would be required to prove its inapplicability beyond a reasonable doubt. *United States v. Mayo,* 705 F.2d 62, 74 (2d Cir.1983). The minimal burden placed on the defendant does not impinge upon his constitutional rights because the government ultimately bears the burden of disproving the applicability of the exception once it is properly raised. *See Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed. 508 (1975); *United States v. Oba,* 448 F.2d 892, 894 (9th Cir.1971), *cert. denied,* 405 U.S. 935, 92 S.Ct. 979, 30 L.Ed.2d 811 (1972).

In *Mayo,* this court considered whether an analogous exception to a licensing requirement constituted an affirmative defense or an element of the crime. The defendants challenged their convictions for dealing in firearms in violation of 18 U.S.C. § 921(a)(16)(B) (1982). Judge Meskill observed that affirmative defenses arise where "the legislature has manifested its judgment that the activity proscribed by the general prohibition can best be justified or explained by the defendant.... Exceptions to a general prohibition are a legitimate means to implement a legislative design and often serve to define the scope of the prohibition." *Mayo,* 705 F.2d at 74 (citation omitted). Judge Meskill then concluded that the exception regarding "antique" firearms constituted an affirmative defense rather than an element of the crime. In reaching this conclusion, *Mayo* relied upon the text and legislative history of the statute as well as the relative abilities of the parties to produce evidence on the question.

The legislative history of the Arms Export Control Act is sparse. Passed in 1976, the Act provided for "increased congressional supervision and review of all aspects of the foreign military sales program." H.R.Rep. No. 1144, 2d Sess. 8 *reprinted in* 1976 U.S.Cong. & Ad.News 1378, 1385. Specifically, Congress replaced the Mutual Security Act of 1954, then the basic authority for control of military related exports and imports, and imposed strict requirements on "exports and imports of all defense articles and defense services." *Id.* at 1411. The House Report warned that "arms transfers cannot become an automatic, unregulated process." *Id.* at 1388. In sum, Congress manifested a clear intent to prevent unlicensed exports of defense

articles, but it provided no guidance on the specific question before us.

■ Following Judge Meskill's thoughtful analysis, we now consider the text of the Arms Export Control Act. Section 2778(b)(2) states broadly that "... no defense articles or defense services designated by the President under subsection (a)(1) of this section may be exported or imported without a license." This same section, however, carves out a narrow exception for export made by or for a department or agency of the United States Government for official use or for carrying out any foreign assistance or sales program. Thus the basic rule provides that unlicensed exports are illegal, except in precise and limited circumstances. This phrasing is not itself determinative. Where, however, as here, a statutory prohibition is broad and an exception is quite narrow, it is more probable that the exception constitutes an affirmative defense and that the defendant bears the burden of demonstrating that his actions conformed to the limited exception.

The third *Mayo* factor considers the parties' relative ability to adduce evidence that an export falls within the exception. In the case of antique firearms, defendants were certainly better able than the government to provide documents authenticating the firearm's antiquity. Appellant seizes upon this aspect of the *Mayo* analysis to distinguish it from the situation at hand. He notes that the government itself retains all the records for exports shipped under the "official use" or "foreign military sales" exceptions. Thus, he contends the government is in a better position to produce evidence that the exemptions did not apply. Even if a shipment comes under one of these exceptions, however, and therefore does not require licensing, the ITAR regulations mandate an ample paper trail that is readily accessible to defendants. For example, at a minimum, both exemptions require a private intermediary to obtain a government bill of lading. 22 C.F.R. § 126.4 (1986).

Durrani protests that the paper trail that exists in most cases provides him with little comfort given the extraordinary backdrop to this prosecution. Specifically, he argues that the unprecedented scenario of high government officials shipping arms to Iran made access to probative evidence impossible. We need not address this issue, however, because Durrani has failed to press his challenge to the lower court's quashing of his February 27, 1987 subpoena *duces tecum* which requested all documents from the government regarding the Iran-contra scandal. We sympathize with Durrani's difficulties of proof. Nevertheless, we are constrained to interpret the statute in a reasonable fashion, consistent with the text and congressional intent.

Accordingly, the applicability of the "official use" exception was an affirmative defense.

■ Thus, Durrani bore the burden of producing some evidence that the statutory exception was applicable. *Mayo,* 705 F.2d at 76. He produced no such evidence except his own testimony. While a defendant's credible testimony standing alone should suffice to raise a defense, Durrani's statements were so inconsistent they failed to create even a colorable inference that he came within one of the exceptions.

Discrepancies punctuate Durrani's statements about these events and raise serious doubts about his credibility. Durrani's insistence that Pires had complete responsibility for licensing directly contradicts his frequent assurances to Doyle that he would personally obtain them. It also contradicts his statement to Special Agent Steven Arruda, shortly after being taken into custody, that "I don't know why I'm arrested, I have all the licenses in California."

Moreover, doubt surrounds each of Durrani's alleged meetings with officials of the U.S. government. In his affidavit, Durrani claimed he initially suspected and later confirmed that Jack Koser worked for the NSC. At trial, however, he retreated from this assertion, admitting that he lacked any basis for believing that Koser was affiliated with the government. Indeed, Durrani went so far as to admit that when he met Koser he "had no reason to believe he was anything [other] than [an] employee of Mr. Pires." Although Durrani testified he

was to contact Koser when the October 3rd shipment reached Jet Stream, he could not explain the method by which he was to do so. Finally, Michael Sneddon of the NSC testified that the council had no employee named Jack Koser.

Discrepancies also arose regarding Durrani's purported relationship with Col. North, and their alleged meeting in London prior to the October 3d shipment. During trial, Durrani described three meetings with North over a period of five days. His affidavit describes only one meeting. At trial, Durrani testified that when North summoned him to the meeting at the London Hilton, he recognized North's voice from a previous conversation. He added that North used the code name "Mr. White," but that he considered it a joke and called North by his real name. In his affidavit, however, Durrani states that he has "come to believe" that Mr. White was actually North—not that he knew this all along.

Moreover, Durrani testified that he met North alone, except for two people seated near them in the lobby of the London Hilton, neither of whom spoke to him. But before trial, Durrani claimed he and North were joined by American officials and an Anglican Church representative. Finally, Durrani testified that North instructed him to obtain the missile parts for Iran, and not to worry about the paperwork. In his affidavit, Durrani attributed this instruction to the unnamed "American officials." Thus, Durrani's defense crumbles, and the government did not have an obligation to negate the statutory exception. Although Judge Daly correctly stated the law of affirmative defense in his charge to the jury, we conclude that this charge was unnecessary.

In addition, upon a review of the entire record, we are satisfied that appellant has not met his "heavy burden," on appeal, to question the sufficiency of the government's case negating the statutory exception. *United States v. Losada*, 674 F.2d 167, 173 (2d Cir.), *cert. denied*, 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982). Appellant contends that Charles Moyer's and Michael Sneddon's testimony were inadmissible because they relied on records which were not "regularly reported" as Fed.R.Evid. 803(10) requires. For example, Sneddon testified that there was no evidence North was in London when Durrani claimed to meet him, but, on cross-examination, admitted he had no record of North's now notorious visit to Teheran in May of 1986. Moyer stated that only the CIA procured parts for North, despite evidence currently indicating private parties were involved in aspects of the scandal. Although in other circumstances these contentions might have merit, any error here is harmless because the government was not required to negate the statutory exception.

*"Reasonable Belief" Charge*

Appellant next contends that the judge erred in refusing to charge on the first count, the completed shipment, that "even if the government was not involved in the shipments, the jury should acquit if defendant reasonably believed the government was involved." The court did give this instruction on the second count, the attempted export accusation. This argument implicitly raises two theories: a mistake of law defense, premised on the theory that North or Pires told Durrani that the statutory requirement would not apply to this transaction, and a contention that Durrani lacked specific intent to violate the law.

It is well settled that ignorance of the law or mistake as to the law's requirements is no defense to criminal conduct. *United States v. International Minerals and Chemical Corp.*, 402 U.S. 558, 563, 91 S.Ct. 1697, 1700, 29 L.Ed.2d 178 (1971). An exception has been carved out for legitimate reliance on an official interpretation of law. *Cox v. Louisiana*, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965). *See also People v. Weiss*, 276 N.Y. 384, 12 N.E.2d 514 (1938) (exception for responding to a police officer's call for assistance in making unlawful arrest). In *United States v. Barker*, 546 F.2d 940 (D.C.Cir.1976), Judge Wilkey recognized an exemption, under which one escapes liability for following instructions by someone

with "apparent authority" to approve the conduct, who turns out not to have such power. The only case we have decided on this issue adopts a stricter standard, requiring that government officials have actual authority. *United States v. Duggan,* 743 F.2d 59 (2d Cir.1984). Even if we adopted the *Barker* view, appellant's argument fails because, as he candidly admits in his brief, he never testified he believed government involvement made licenses unnecessary for the first shipment. Without such evidence, the trial judge acted within his discretion in holding that the defense had not raised a sufficient issue to require the "reasonable belief" defense to be put to the jury on the first count.

■ We also find no error in the trial judge's handling of Durrani's claim that he lacked specific intent to violate the law. The question of intent was put squarely to the jury and resolved against Durrani. The jury charge explicitly required that:

the Government must prove beyond a reasonable doubt each of the following essential elements.... Four, the defendant knowingly and willfully caused the defense articles to be exported.

....

The fourth element ... requires that the Government prove that he had the specific intent to commit that particular offense.... That term, specific intent, as it applies here, means that the defendant knowingly did an act which the law forbids, or knowingly failed to do an act which the law requires purposely intending to violate the law.... Therefore, if the defendant, Mr. Durrani, knew he was required to obtain an export license before causing defense articles to be exported, and if you find that he did cause such an exportation, and intentionally failed to do so with the purpose of evading the arms exportation laws and regulations that are charged here, then he would have willfully failed to obtain the appropriate export license.

This explanation of specific intent more than adequately justifies the charge. A charge in the specific language defendant proposed was not required. *United States*

*v. Dyman,* 739 F.2d 762, 771 (2d Cir.1984), *cert. denied,* 469 U.S. 1193, 105 S.Ct. 969, 83 L.Ed.2d 973 (1985).

### Burden Of Proof

■ Durrani also challenges the jury instruction relating to the burden of persuasion on the license requirement. Appellant contends that the charge shifted the burden to the defendant. In fact, the judge placed the burden of proof squarely on the government as to each element of the offense:

I charge you that in all criminal cases the burden is on the government to prove a defendant's guilt by what is called proof beyond a reasonable doubt. And the burden of proof remains on the government and never shifts to the defendant.... Remember also that the Government has the burden of proof on each and every element of each of the offenses charged.... Now, in order to establish the defendant's guilt under Count 1 of the indictment, the Government must prove beyond a reasonable doubt each of the following essential elements....

Appellant's core concern revolves around the judge's charge that defendant believed he was acting in connection with the government. The judge instructed the jury:

[i]f you find and accept as true the evidence in support of these contentions and theories and *believe the defendant's defense theory,* and this belief leaves you with a reasonable doubt as to whether the Government has proved beyond a reasonable doubt each and every element of the crimes charged in either of or both Counts 1 and 2, then you must find the defendant not guilty.... (emphasis added).

Durrani seizes upon the wording, "believe the defendant's defense theory," in characterizing the charge as requiring the jury to credit Durrani's testimony if it desired to acquit. This ignores the context of that phrase. For immediately thereafter, the judge emphasized the proper inquiry, whether "this belief leaves you with a rea-

sonable doubt." As such, he clearly instructed the jury that a reasonable doubt regarding the truth of defendant's theory should lead to acquittal. Thus, in light of the totality of the jury instructions, we find no error. *See United States v. Gengo*, 808 F.2d 1, 4 (2d Cir.1986).

We are also unconvinced by Durrani's related argument that the portion of the charge dealing with his credibility shifted the burden of proof. His credibility became a matter for the jury when he took the witness stand. The court did not single out the defendant in its instruction on weighing the credibility of witnesses, except for a discussion on false exculpatory statements. On that question, the trial judge commented that, "[o]rdinarily, it is reasonable to infer that an innocent person does not usually find it necessary to invent or fabricate an explanation or statement th[at] tends to establish the person's innocence." Although this instruction might well have been clarified, it correctly stated the law in this circuit. False exculpatory statements made to law enforcement officials are circumstantial evidence and have independent probative force. *United States v. Parness*, 503 F.2d 430, 438 (2d Cir.1974), *cert. denied*, 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975); *United States v. Lacey*, 459 F.2d 86, 89 (2nd Cir. 1972).

In sum, the trial judge gave the jury accurate instructions on the government's burden of proof, which required it to prove beyond a reasonable doubt Durrani's specific intent to violate the licensing requirement, and on Durrani's contention that no license was required because he was acting on behalf of the government. Considered as a whole, the charge "adequately apprised the jury of the elements of the crime charged and [the] defense." *United States v. Durham*, 825 F.2d 716, 719 (2d Cir.1987) (citation omitted).

Appellant also challenges the prosecutor's summation as denying him a fair trial by shifting the burden of proof. The closing, however, simply emphasized the "implausibility of Mr. Durrani's story," by calling attention to his prior inconsistent statements. Moreover, the prosecutor's argument repeatedly acknowledged that the government bore the burden of proof. This was not error. Durrani also maintains that comments by the prosecutor forced the jury to choose between believing either Durrani or the government witnesses. The prosecutor said,

> And in deciding whether you believe him, you're going to have to come back to this testimony and look at it and throw the Government's whole case, the hard facts, the physical evidence, the testimony of all the Government's witnesses out the window. Because if Mr. Durrani is telling you the truth in his most recent statement from the witness stand, Mr. Doyle is lying, Mr. Spreeuwenberg is lying, Mr. Moosa is lying, the bank records are lying, Mr. Arruda is lying about the statement, C.I.A. is lying to you, the National Security Council is lying to you, Mr. Newborn is lying to you....

But the prosecutor was again focused on the important question of Durrani's credibility. Recently, this court has reprimanded prosecutors engaging in a pattern of behavior which forces the jury to choose between believing government agents or criminal defendants. *United States v. Richter*, 826 F.2d 206 (2d Cir.1987). In *Richter*, however, the prosecutor not only stated in closing that the jury had to so choose, but, more importantly, asked the defendant on cross-examination whether the police officers were telling the truth. Determinations of credibility are for the jury, not for witnesses. *Richter*, 826 F.2d at 208 (citations omitted). Here, on the other hand, the prosecutor's closing placed in stark relief for the jury one of the crucial issues in the case: whether Durrani's testimony satisfied his burden of coming forward with some evidence that he was acting for the United States government. As such, these comments were proper.

### Tower Report and North Memoranda

The trial judge's rulings on questions of law reflect his awareness of the unique context for this prosecution—the saga of high government officials engaged in a cov-

ert operation to sell arms to Iran. The investigations into those events are only now providing glimpses of the activities of North and his cohorts. We may never know all the details of their operations. This necessarily heightened Durrani's difficulties in presenting his defense and prompted several close evidentiary rulings. Appellant challenges both the trial court's refusal to admit evidence he proffered and its willingness to admit certain prosecution evidence.

Durrani initially filed a subpoena *duces tecum* requesting a broad range of documents relating to the Iran-contra scandal from the government. As these demands came on the eve of trial, the judge quashed them on March 11, 1987, after a hearing and an *ex parte* review of the disputed evidence. The judge found none of the classified documents disclosable to the defense. Durrani does not challenge this determination. Nevertheless, one of the requested documents, a list of Hawk missile parts given to George Cave of the CIA by the Iranians in March 1986, was provided to the defendant and was ultimately introduced into evidence.

On March 26 and 27, 1987, Durrani sought the admission of a section of the Tower report on the Iran-contra scandal. He also proffered two documents which were contained in the Tower report. The first was a "PROF" note [5] by North to Vice Admiral John Poindexter, the President's National Security Advisor, dated April 16, 1986. The second document was a September 8, 1986 update of North's paper "Next Steps with Iran," also prepared for Poindexter. Appellant claims that these documents were offered as evidence of the critical factual issue in the case: whether Durrani's activities were connected with the government's arms deals with Iran. Durrani asserts that the Tower report excerpts identify private individuals—not the CIA—as the primary purchasers of parts to be shipped to Iran. The April 16th memo, he claims, reports a shortage of Hawk mis-

sile parts, which presumably corroborates his assertion that North had asked him to procure the missing parts. The September 8th memo reportedly assured Poindexter that the missing parts had been found, impliedly through the efforts of Durrani.

The court found both the report and the North memoranda to be hearsay and not within an exception. Specifically, the judge determined that the documents "lacked sufficient indicia of trustworthiness so as to be admissible under either Rule 803(8)(c) or Rule 803(24)." He concluded that the Tower report was inherently unsound for several reasons: the two-year interval between some of the events and the investigations, the repeated failures of recollection by major policymakers, the particular mandate of the board to emphasize policy reforms for the NSC over resolving factual conflicts, the limitations on the board's ability to gather evidence, and the possible motivation of the underlying sources of information to mislead the board. Thus, the report was inadmissible. The court similarly questioned the trustworthiness of the two North memoranda.

Petitioner advances three grounds for the admissibility of the Tower report and the North memos: first, as an admission of a party opponent, Fed.R.Evid. 801(d)(2)(D); second, as a public record, Fed.R.Evid. 803(8); and, third, pursuant to the "catchall" exception of Fed.R.Evid. 803(24). All are inadequate to disturb the decision below.

██ The lower court's decision, although thoughtful, was perhaps ill-advised, given the extremely sparse evidence otherwise available to defendant. Nonetheless, it was well within the wide discretion afforded the trial judge in determining "whether the hearsay document offered in evidence has sufficient independent indicia of reliability to justify its admission." *City of New York v. Pullman, Inc.*, 662 F.2d 910, 914 (2d Cir.1981), *cert. denied*, 454

---

**5.** The "PROF" system is an interoffice mail system run through an IBM main frame computer and managed by the White House Communications Agency for the NSC. All NSC officers have personal passwords which enable them to send and receive messages to each other from terminals.

U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982).

 If any error occurred, moreover, it was harmless. We have no hesitation concluding, beyond a reasonable doubt, that the outcome would have been the same if the proffered evidence had been admitted. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In light of his implausible trial testimony, Durrani's assertion of official sanction for his action lacks any credibility.

Durrani's February 4, 1987 affidavit, first raising this claim, followed closely after the first complete public disclosure on the Iran-contra scandal, and thus provokes great suspicion. The Senate Intelligence report on the affair was released in January of 1987. Discrepancies between Durrani's affidavit and his testimony concerning whom he met, how many meetings took place, where they occurred, what the participants said, and when information was conveyed further undermined his claim. Durrani even retracted statements that he had been able to confirm the relationship of certain named individuals with the NSC or CIA.

We must consider, as well, his post-arrest statement that he had all the licenses; his claim at the bond hearing that the licensing requirement was unclear; his assertion to this court in the detention review that he understood that KRAM and/or Risenvest was going to forward the parts to Jordan; and, his contention that KRAM purchase orders which Durrani "has been able to retrieve from his files" put the responsibility for getting the licenses on Jet Stream. Together these demonstrate that his story was inherently untrustworthy.

In light of the overwhelming bases for the jury to reject Durrani's testimony, we are convinced that the documents he proffered could not have affected in the least the destruction of his credibility.

*Munitions List*

Durrani now attacks as hearsay the government's evidence whether his parts were on the Munitions List. At trial, however, defense counsel conceded that the parts were on the list, stating, "[w]e don't dispute, at least as far as the Hawk missile parts that they're on the list.... That's not in the dispute concerning the Hawk missile parts. They're clearly listed up. Clearly they would need an export license." The Munitions List does not identify particularized items, but rather broad categories of parts. The fourth category includes missile systems and "[a]ll specifically designed or modified components, parts, accessories, attachments and associated equipment" for such systems. 22 C.F.R. § 121.1 (1986). The designation of items on the Munitions List is a function committed by law to the State Department with the concurrence of the Defense Department. 22 U.S.C. § 2778(a)(1) (1982); 22 C.F.R. § 120.2 (1986).

The government offered the testimony of Billy Boland of Redstone Arsenal and Brenda Carnahan of the State Department's Office of Munitions Control to prove that the parts Durrani purchased were Hawk missile system parts and that they appeared on the Munitions List.

 Boland, an electronic technician equipment specialist at the Hawk Project Office, testified that the parts in question were specifically designed for the Hawk system. Appellant contends this testimony was hearsay because, on cross-examination, Boland admitted he was not involved in the manufacturing process and thus lacked personal knowledge whether the parts had alternative uses. Nevertheless, Boland was qualified without objection as an expert witness on Hawk missile systems, and therefore had sufficient personal knowledge to satisfy the hearsay concern.

 Carnahan explained that her office had made a licensing determination that Hawk missile parts were on the Munitions List. Appellant contends, however, that the testimony should have been excluded because the witness conceded that her determination was based on a telephone conversation with an engineer at Redstone Arsenal. The statute empowers the State Department to determine whether Hawk missile parts appears on the Munitions List. Carnahan's testimony apprised the jury that the State Department had made such a determination, and is thus not hearsay.

## Disqualification Motion

On February 4, 1987, the defendant filed a motion to disqualify Chief Judge Daly, who had been presiding over this case since shortly after the grand jury returned the indictment on October 9, 1986. Appellant now appeals from the denial of that motion.

The motion charged that random criminal case assignment procedures were "deliberately subverted" in this case, "apparently allowing the government and the Chief Judge in concert to assign him to this case." In support of the motion, defendant's trial counsel submitted two affidavits. The first one described what were believed to be the details of the random assignment procedure then in effect. It also outlined the Assistant United States Attorney's purported request to Magistrate Latimer that this case should be looked at by the Chief Judge before assignment, "because of the national security nature [involved]." The first affidavit also described events which, it alleged, indicated that the prosecutor had informed the Chief Judge that superseding indictments might be expected. The second affidavit asserted that the judge's decision to detain Durrani without bail demonstrated bias.

On February 24th, the trial judge denied the disqualification motion as untimely. He also found it procedurally defective because it was not accompanied by a certificate of good faith by counsel. Moreover, he rejected the claim as a matter of law, noting that "[c]ommunications between the Chief Judge and the Supervising Assistant United States Attorney in the same … court as th[e] judge, and the position of the judge with regard to the defendant's bail, are insufficient as a matter of law to support a motion to disqualify." (citation omitted) Counsel for defendant then filed a motion for reconsideration on March 6th which incorporated a certificate of good faith. The judge promptly denied this as well, remarking that it seemed primarily aimed at delaying the trial.

 Charges of impropriety or bias are serious, as "justice must satisfy the appearance of justice." *Aetna Life Ins.*

*Co. v. Lavoie,* 475 U.S. 813, 825, 106 S.Ct. 1580, 1587, 89 L.Ed.2d 823, 835 (1986) (citation omitted). Nevertheless, motions to disqualify must be timely and contain certificates of good faith to safeguard both the judiciary from frivolous attacks upon its dignity and the court system from last-minute dilatory tactics. *Town of East Haven v. Eastern Airlines, Inc.,* 304 F.Supp. 1223 (D.Conn.1969). In *In re Martin-Trigona,* 573 F.Supp. 1237, 1244 (D.Conn. 1983), *appeal dismissed,* 770 F.2d 157 (2d Cir.1985), *cert. denied,* 475 U.S. 1058, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986), the trial judge found untimely a lapse of twelve days. Here four months passed between the events of which appellant complains and the filing of the motion to disqualify. That the motion was made on the eve of trial buttresses the trial judge's conclusion that it was intended primarily to delay proceedings. The district court, thus, correctly rejected the motion.

### CONCLUSION

For the foregoing reasons, we affirm the conviction in all respects.