813 F.Supp. 698 (1993)
UNITED STATES of America, Plaintiff,
v.
Ronald K. CARROLL, Defendant.
No. 4:92 CR 319 DDN.
United States District Court, E.D. Missouri, E.D.
January 28, 1993.
*699 Frederick J. Dana, St. Louis, MO, for the U.S.
John Garvey, St. Louis, MO, for defendant.

OPINION
NOCE, United States Magistrate Judge.
This action was tried to the Court sitting without a jury on January 6, 1993. The parties have filed their post-trial memoranda and the matter is now before the Court for decision.
Defendant Ronald K. Carroll is charged by information with two counts. Count 1 alleges that he violated Title 18, United States Code, sections 2 and 371, by aiding and by conspiring with John Christopher *700 Vincent to violate Title 36, Code of Federal Regulations, sections 2.1(a)(5) and 2.17(a)(3). Count 1 also alleges that Carroll furthered the conspiracy by committing four overt acts. Count 2 alleges that defendant Carroll created and maintained a hazardous condition on the grounds of the Jefferson National Expansion Memorial, in violation of Title 36, Code of Federal Regulations, section 2.34(a)(4).
From the evidence adduced during the trial, the Court makes the following findings of fact and conclusions of law, beyond a reasonable doubt:

FACTS
1. On Saturday, September 12, 1992, John Christopher Vincent arrived at Lambert-St. Louis International Airport, outside St. Louis, Missouri. Vincent is a professional parachute jumper, a licensed parachute rigger, and a jump master. He had previously made more than one hundred BASE ("Base, Antenna, Structure, Equipment") jumps, each one successful. He came to St. Louis to climb to the top of the gleaming, stainless steel, 630 foot tall, inverted catenary arc, commonly known as the St. Louis Arch and then to parachute from its pinnacle. He had researched the Arch and its history. He brought with him the climbing equipment he would need for the feat. He rented an automobile and drove from the airport into St. Louis to view the Arch. The Arch is on the grounds of the Jefferson National Expansion Memorial, a federal park in this judicial district which is administered by the National Park Service. The Arch is located in the eastern part of downtown St. Louis. In the visitors' center beneath the legs of the Arch, Vincent viewed a motion picture which displayed the construction of the Arch. Vincent noted the method by which the heavy equipment climbed up the sides of the Arch during construction. When the movie ended, he went outside and walked to the side of the Arch. There he pressed a suction cup, used for climbing, against the Arch, to see whether it would adhere to its stainless steel skin. It worked.
2. Vincent then drove to an electronics store and purchased a video camera, Government's Exhibit 1, which he intended would be used by someone else to record his planned parachute jump from the top of the Arch. It was important to Vincent that his parachute jump from the Arch be recorded. At least one of his prior jumps had been video taped. From another store he purchased a radio transceiver with two head sets, Government Exhibit 3; he intended to wear one head set as he climbed the Arch while someone else stationed on the ground below the Arch wore the other. With the radio equipment Vincent intended to direct the filming of his jump and to alert the persons on the ground in the event he encountered difficulty during the climb to the top.
3. The next day, at an apartment complex in South St. Louis County, Vincent and a female companion met Robert Weinzetl and defendant Ronald K. Carroll while all four were relaxing at the apartment complex swimming pool. Weinzetl lived in one of the apartments and Carroll worked there as a maintenance technician. Vincent engaged them in general conversation and then left the pool area. Two hours later, he returned and rejoined Carroll, Weinzetl, and the other swimmers. Vincent told them that he was a "BASE" jumper and that he intended to climb and jump off a building in St. Louis. He told them what the acronym "BASE" stood for. The group was incredulous. Vincent said he had a video tape of his jump from the World Trade Center. The group asked him to show it, which he did in Weinzetl's apartment. Carroll was present and viewed the video tape. Vincent again said he was in St. Louis to jump off a building and he asked whether anyone wanted to accompany him. Weinzetl and others, including Carroll, said that they did. At Vincent's request, Carroll agreed to take pictures of the jump. Vincent then announced that anyone willing to go with him should meet him in the apartment complex parking lot at 2:30 a.m. the next morning. After Vincent left Weinzetl's apartment, the group which remained, including Carroll, discussed whether what Vincent had told *701 them was true. Not all of the group remained interested in accompanying Vincent.
4. At 2:30 the next morning, Vincent knocked on the door of Weinzetl's apartment. Weinzetl agreed to go with him. They knocked on the door of Weinzetl's friend Steve, but received no response. Weinzetl suggested that Carroll would be game and sure enough, after being roused from his bed, Carroll presented himself for the exploit.
5. They left the apartment complex at 3:00 a.m. in two cars. Vincent drove himself in his rental car and Carroll drove his car with Weinzetl his passenger. Vincent told them to follow him to the building he would climb. He led the way downtown. Once downtown, Vincent drove near the Arch and parked on the Mississippi River levee, near Eads Bridge, not far from the Arch. Carroll and Weinzetl then, for the first time, suspected that Vincent intended to climb and jump from the Arch.
6. All three got out of their cars. Immediately Vincent confirmed their suspicions and said that he was going to climb and jump from the Arch. Carroll and Weinzetl said they did not want to go onto the Arch grounds, to avoid trouble with the authorities because of the jump. Vincent told them that, by merely photographing the jump, they would not be doing anything illegal. Vincent knew that parachuting from the top of the Arch without a permit or appropriate permission was illegal. He told Carroll and Weinzetl about the incident in 1980, when an individual was killed when he attempted to parachute jump from the top of the Arch. Vincent said that the people who were to photograph that jump were only interviewed by the authorities and then released without being prosecuted. Vincent then gave a still picture camera, Government Exhibit 4, to Weinzetl to use. He gave the video camera and one of the two radio transceiver head sets to Carroll. Carroll agreed to operate the video camera to photograph the jump and he agreed to operate the radio transceiver. Vincent told them that he expected his female companion from the swimming pool to arrive at 5:45 a.m.; Vincent did not tell them what her role in the escapade would be. Vincent then hurriedly strapped on his climbing equipment, picked up all the rest of his climbing gear, and walked toward the Arch followed by Carroll and Weinzetl.
7. When they reached the foot of the Arch, Vincent directed Carroll and Weinzetl to a location nearby and he began his climb up the north leg of the Arch using the suction cups, and other equipment. He carried water and two parachutes, a main parachute and a reserve parachute which was capable of opening at an altitude of fifty feet. At the base of the Arch he purposely left behind a set of carabineers (climbing rings) in a black bag. At first Carroll and Weinzetl sat in the grass under the Arch and watched Vincent climb. During the climb, Vincent stopped and drank water. He radioed Carroll and Weinzetl that he was all right. In response, Carroll and Weinzetl radioed to him that he should hurry, because they were nervous. After a while, Carroll and Weinzetl both picked up Vincent's bag of unneeded equipment and carried it to Carroll's car where they placed it in the trunk. There they waited.
8. At 5:45 a.m. Vincent's getaway driver, his female companion of the day before, drove to where Carroll and Weinzetl were parked. She asked them whether Vincent was "doing it." They answered that he was. Carroll and Weinzetl then drove down the levee and parked closer to the Arch. They stayed in their parked car until 6:15 a.m. when they got out and walked onto the Arch grounds of the Jefferson National Expansion Memorial.
9. Two hours and ten minutes after he began, at approximately 5:30 a.m., Vincent reached the top of the Arch. At the top he savored the height, the sight, the thrill of being there, and the anticipation of the jump.
10. At 7:00 a.m., with the sun just above the horizon, Vincent readied himself to jump and alerted Carroll and Weinzetl below by way of the radio transceiver. He could see that Carroll and Weinzetl were in position. Vincent directed them to begin filming and taking photographs. He told *702 Carroll to zoom the video camera lens in and out and to photograph the entire Arch; Carroll did so and so advised Vincent. Vincent saw that his getaway transportation was parked nearby. He told Carroll and Weinzetl that he was ready. By radio, Carroll encouraged Vincent. With "Blue sky, black death," spoken by Carroll and by Vincent, Vincent hurled himself off the top of the Arch. After freefalling clear of the Arch, he opened his main chute and descended to the ground between the legs of the Arch without injury. Carroll and Weinzetl filmed him as he descended. Other people were on the Arch grounds and saw the parachute jump. As soon as he landed, he told Carroll and Weinzetl to continue taking pictures. Vincent quickly gathered his parachute and ran toward his getaway car which was located on the street between the Arch and the levee. Carroll and Weinzetl also began running, taking still and moving pictures as they ran, toward their car. While they were running, Carroll for the first time saw, and told Weinzetl, that they were being chased by an officer, Chief Park Ranger Daryll B. Stone who had seen Vincent land. They ran faster. Vincent made good his getaway. Carroll and Weinzetl were caught, detained, and issued violation notices for their activities.
11. Neither Vincent, Carroll, nor Weinzetl had applied for or received an appropriate permit, permission, or authorization either to climb the Arch, to jump from it, or to photograph the jump.

DISCUSSION OF LAW

1. Jurisdiction and venue.
Each of the offenses with which defendant Ronald K. Carroll is charged is a Class B misdemeanor, a petty offense. See, 18 U.S.C. §§ 19, 3581(b)(7); 36 C.F.R. § 1.3(a). This action is properly before the undersigned United States Magistrate Judge for trial and the rendering of judgment, pursuant to 18 U.S.C. § 3401(b). From the facts found above, the matters alleged by the government occurred within this judicial district and venue is properly in this Court. See, Fed.R.Crim.Pro. 18.

2. Count 1.
Count 1 charges defendant Carroll with a violation of 18 U.S.C. §§ 2 and 371, by conspiring with John Christopher Vincent on or about September 14, 1992, to violate 36 C.F.R. §§ 2.1(a)(5)[1] and 2.17(a)(3)[2]. The essential elements of a violation of § 371 are that the defendant (a) agreed with another person (b) knowingly to engage in conduct which violates federal law and (c) that at least one of the parties to the agreement committed an act in furtherance of the unlawful objective of the agreement. United States v. Andrade, 788 F.2d 521, 525 (8th Cir.), cert. denied sub nom., Riley v. United States, 479 U.S. 963, 107 S.Ct. 462, 93 L.Ed.2d 408 (1986). See also, Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit, § 5.06A (1992); 2 Devitt, Blackmar, and O'Malley, Federal Jury Practice and Instructions, § 28.03 (West 1990).
Count 1 also alleges that defendant Carroll committed four overt acts in furtherance of the conspiracy, i.e.:
1) On or about September 14, 1992, defendant Ronald Carroll, in his automobile, drove Robert Weinzetl from Robert Weinzetl's residence to the parking lot located on the grounds of the St. Louis Arch.
2) On or about September 14, 1992, defendant Ronald K. Carroll operated a camcorder and in doing so recorded John *703 Christopher Vincent as he jumped by means of a parachute from the top of the Jefferson National Expansion Arch in St. Louis onto the grounds of the Jefferson National Expansion Memorial without permission of the superintendent of the National Park Service.
3) On or about September 14, 1992, defendant Ronald K. Carroll transported climbing equipment belonging to John Christopher Vincent.
4) On or about September 14, 1992, defendant Ronald K. Carroll operated and monitored a radio transceiver.

(a) and (b) The agreement and its objective.
"The gist of ... conspiracy ... [is] the agreement." Blumenthal v. United States, 332 U.S. 539, 555-56, 68 S.Ct. 248, 256, 92 L.Ed. 154 (1947). The contents of such an agreement, understanding, and common purpose may be discerned from the words spoken by and the other actions of the conspirators and the circumstances of all of the relevant events. United States v. Hermes, 847 F.2d 493, 495 (8th Cir.1988). The Court finds and concludes from the evidence adduced at trial, beyond a reasonable doubt, that defendant Carroll agreed with, came to an understanding with, and entered a common purpose with John Vincent. Their common, principle objective was Vincent's climbing the Arch and descending from it by parachute, in violation of federal law, i.e., 36 C.F.R. §§ 2.1(a)(5) and § 2.17(a)(3). Their agreement, understanding, and common purpose also included the activities of defendant photographing the jump and operating the radio transceiver during the climb and the jump.
The climb and the jump were the major components of the agreement and they were unlawful. Section 2.1(a)(5) proscribes the acts of climbing, ascending, walking on, and descending a national monument except under conditions established by the superintendent. No evidence adduced at trial indicates that there were any conditions under which Vincent would have been allowed to climb and parachute from the Arch. Section 2.17(a)(3) proscribes the delivery of a person or an object by parachute without a permit. The evidence is undisputed that no permit or other authorization was granted for the climb or the parachute jump.
The video recording was, and was known by defendant to be, a substantial part of the overall climb and jump exploit. Vincent had purchased the video camera new and obtained defendant's promise to operate it. Defendant knew that Vincent had recorded at least one prior BASE jump. It was apparent to defendant that Vincent's ability to display recordings of his BASE jumps was important to Vincent. One might speculate that Vincent would still have climbed and jumped, even if no one photographed the exploit. But such speculation is irrelevant to this case, because all of the participants in the exploit, including defendant, acted as though the video recording was important.
The use of radio equipment for communication to and from Vincent and the defendant also was, and was known by defendant to be, a substantial part of the overall climb and jump exploit. The very term "BASE," used by Vincent to describe these jump activities to defendant and others, includes a reference to the use of an antenna, for radio communication. Just as he purchased the video camera new after he arrived in St. Louis, so did he purchase the radio transceiver with two head sets new. Such communications would convey encouragement from the people on the ground (as occurred in this case), directions by Vincent for the photographic recording of the jump (as occurred in this case), and information about any difficulty encountered by the climber. Although there was no evidence that Vincent encountered any difficulty during the climb or the jump, this and the other intended potential uses of the radio equipment were parts of the understanding and agreement between the defendant and Vincent before the climb began.
Beyond a reasonable doubt, the Court finds that defendant believed that the overall exploit of the climbing and the parachute jumping from the Arch, and his involvement *704 in it, were unlawful. After he had arrived on the levee, defendant did not want even to enter the Arch grounds, because he feared being charged by the authorities. Vincent assuaged this fear by recounting that in the 1980 incident those who photographed the jump were only questioned, not prosecuted. That defendant knew that his participation in the exploit was unlawful is supported by the evidence that, immediately after Vincent landed safely, and before he knew that a law enforcement officer was running toward them, defendant began running to leave the area. In the circumstances of this case, defendant's flight is some evidence that he knew that what he had done was unlawful. United States v. Hankins, 931 F.2d 1256, 1261 (8th Cir.), cert. denied, ___ U.S. ___, 112 S.Ct. 243, 116 L.Ed.2d 198 (1991).

(c) The overt acts.
An overt act in the commission of a conspiracy, in violation of 18 U.S.C. § 371, need not be a criminal act in and of itself. United States v. Lewis, 759 F.2d 1316, 1344 (8th Cir.), cert. denied, 474 U.S. 994, 106 S.Ct. 406, 88 L.Ed.2d 357 (1985). After agreeing with Vincent to participate in the climbing-jumping exploit by operating the video camera and the radio transceiver, defendant committed overt acts in furtherance of the conspiracy. He drove himself and Weinzetl to the Arch. He operated the video camera and the transceiver. He and Weinzetl carried the bag of unused equipment from the Arch after Vincent began his climb. All this was alleged in the information.

(d) Aiding and abetting.
The discussion set forth above also establishes that defendant Carroll knowingly aided and abetted Vincent in the unlawful climbing-jumping exploit, in violation of 18 U.S.C. § 2. See, United States v. Brownlee, 890 F.2d 1036, 1038 (8th Cir. 1989) (elements of aiding and abetting).

3. Count 2.
In Count 2 defendant Carroll is charged with a violation of 36 C.F.R. § 2.34(a)(4)[3]. The essential elements of this offense are: that the defendant (1) either (a) with the intent to cause public alarm, nuisance, jeopardy or violence or (b) knowingly or recklessly creating a risk thereof, (2) created or maintained a hazardous or physically offensive condition (3) on land subject to the legislative jurisdiction of the United States. See, 36 C.F.R. §§ 2.34(a)(4), (b).
When defendant participated in Vincent's adventure by operating the radio transceiver and the video camera, he acted at least recklessly, if not intentionally, to participate in the creation of a hazardous condition, the climb and the jump from the Arch. The hazard of the climb and the jump was the risk of or the potential for injury or death to Vincent or to persons on the ground, regardless of Vincent's willingness to accept that risk. As Vincent recounted to Carroll on the levee, a parachutist lost his life jumping from the Arch in 1980. The fact that no one was injured during the exploit of September 14, 1992, does not detract from the hazardous nature of the condition created by defendant and the others.
There are places in our country where the sufficiently skilled can savor the exhilaration and personal satisfaction of accomplishing courageous and intrepid acts, of reaching dreamed of heights, and for coursing dangerous adventures. Many of such places are entrusted to the National *705 Park Service. There are other places appropriately set aside and safeguarded for personal enjoyment without hazard, for the exhilaration of mere observation, and for the appreciation of the imaginings and the works of others. Many of such places also are committed to the National Park Service for safekeeping. The St. Louis Arch and the grounds of the Jefferson National Expansion Memorial are in the latter category. See, 16 U.S.C. §§ 2, 3, 450jj; 36 C.F.R. Part 1.

Conclusion.
For the reasons set forth above, the Court finds and concludes beyond a reasonable doubt that defendant Ronald K. Carroll is guilty of the offenses charged in Count 1 and in Count 2 of the information. The motion of the defendant for judgment of acquittal is denied. Sentencing is hereby set for March 12, 1993, at 2:00 p.m. Defendant shall report to the United States Probation Office for that office's presentence investigation and report.
NOTES
[1] Section 2.1(a)(5) provides as follows:

(a) Except as otherwise provided in this chapter, the following is prohibited:
* * * * * *
(5) Walking on, climbing, entering, ascending, descending, or traversing an archeological or cultural resource, monument, or statute, except in designated areas and under conditions established by the superintendent.
[2] Section 2.17(a)(3) provides as follows:

(a) The following are prohibited:
(3) Delivering or retrieving a person or object by parachute, helicopter, or other airborne means, except in emergencies involving public safety or serious property loss, or pursuant to the terms and conditions of a permit.
[3] Sections 2.34(a)(4) and (b) provide as follows:

(a) A person commits disorderly conduct when, with intent to cause public alarm, nuisance, jeopardy or violence, or knowingly or recklessly creating a risk thereof, such person commits any of the following prohibited acts:
* * * * * *
(4) Creates or maintains a hazardous or physically offensive condition.
(b) The regulations contained in this section apply ... on all lands ... within a park area that [is] under the legislative jurisdiction of the United States.