UNITED STATES of America, Plaintiff,

v.

William OXX, Jonathan Oxx, Martin Tilly, Christopher Berke, David Katz, Steve Mulholland, John M. Henderson, Aaron M. Brennan, and Michael Kvale, Defendants.

No. 96–CR–077 J.

United States District Court,
D. Utah,
Central Division.

Sept. 30, 1997.

Scott M. Matheson, Jr., U.S. Attorney, Matthew R. Howell, Asst. U.S. Atty., Salt Lake City, UT, for Plaintiff.

Fred M. Morelli, Jr., Aurora, IL, for Defendants.

**MEMORANDUM OPINION
AND ORDER**

JENKINS, Senior District Judge.

BACKGROUND

On April 18, 1996, the United States filed a petty offense Information charging each of

the named defendants in separate counts as to each but joined for convenience with violating 36 C.F.R. § 2.17(a)(3) (1995) by "deliver[ing] persons by parachute within the Glen Canyon National Recreation Area without a permit and when not required by an emergency." Investigations by the National Park Service resulted in warrants issued for each defendant. A joint bench trial for all of the defendants was scheduled for September 12, 1996. At the time of pre-trial motion hearings, the Government asserted that during the week of April 28, 1995, through May 3, 1995, each of the named defendants engaged in the activity commonly known as BASE [1] jumping by leaping off the cliffs of Glen Canyon and then, shortly after leaping, deploying a parachute or similar device to glide to a landing in Lake Powell.

On August 29, 1996, each defendant filed a Motion to Dismiss the counts pending against him, asserting, among other things, that the Information is defective. Each defendant contends that the Information should be dismissed because (a) Section 2.17, as written, does not clearly prohibit BASE jumping; and (b) as applied to the facts of this case, Section 2.17 is ambiguous.

After hearing argument, considering proffered facts and testimony, and reviewing the papers submitted on the Motion, and for reasons more fully discussed below, the Court finds that the regulations, as currently written, were not intended to prohibit the BASE jumping activities the defendants were allegedly engaged in. Moreover, the regulation, as applied to the purported conduct of the defendants, suffers from an incurable ambiguity. Accordingly, each defendant's Motion is granted and the Information as to each defendant dismissed.[2]

### ISSUE

In this case the Court is confronted with the question whether a regulation adopted by the National Park Service that was written to prohibit the air delivery of persons or objects into a park can be read to prohibit BASE jumping by enthusiasts already in the park. Specifically, the Court must determine whether BASE jumping constitutes unauthorized air delivery of a person or object in a national park in violation of 36 C.F.R. § 2.17(a)(3).[3] In pertinent part, section 2.17 of the regulations provides as follows:

§ 2.17 Aircraft and air delivery

(a) The following are prohibited:

(1) Operating or using aircraft on lands or waters other than at locations designated pursuant to special regulations.

\* \* \* \*

(3) Delivering or retrieving a person or object by parachute, helicopter, or other airborne means, except in emergencies involving public safety or serious property loss, or pursuant to the terms and conditions of a permit.

The defendants argue that their alleged conduct does not violate subsection (3) because BASE jumping cannot be considered as "delivering ... a person by parachute," within the meaning of Section 2.17(a). Although BASE jumping does involve the use

---

1. BASE is an acronym describing the structures—Buildings, Antennae, Spans, and Earth forms—that devotees of this activity commonly leap from. An activity that is akin to hang gliding, the sport of BASE jumping calls for the base jumper to first leap from a stationary structure of his or her choice and, after enjoying a brief freefall, to then deploy a parachute enabling the jumper to land safely. A person who completes a jump off each of the four structures can be certified as a BASE jumper.

2. Much of the evidence linking the defendants with BASE jumping was uncovered during a warrantless search conducted Park Service Rangers. The defendants have also challenged the constitutional validity of these searches, because the court's ruling on the present motion to dismiss will effectively dispose of the proceeding, it is unnecessary for the Court to decide these other issues. *See United States v. Cusumano,* 83 F.3d 1247, 1250–51 (10th Cir.1996).

3. Although two other district courts have touched upon the issues presented in this proceeding, *see United States v. Carroll,* 813 F.Supp. 698 (E.D.Mo.1993); *United States v. May,* No. CR F–85–242 EDP, slip op. (E.D.Cal. July 8, 1986), neither court engaged in a close analysis of this regulation. The question of whether BASE jumping is conduct that is prohibited by this regulation is thus a question of first impression and is an issue that may be resolved by this Court as a matter of law. *See Aerolineas Argentinas v. United States,* 77 F.3d 1564, 1574 (Fed.Cir. 1996) (citations omitted).

of a parachute, the defendants contend that the types of parachutes used in BASE jumping permit the jumper to control the parachute and engage in horizontal flight. The defendants assert that this element of flight control makes BASE jumping similar to hang gliding and other forms of powerless flight. Def. Motion ¶ 4. Because the regulation defines "aircraft" to include any "device that is used or intended to be used for human flight in the air, including powerless flight," 36 C.F.R. § 1.4(a) (1995), the defendants argue that BASE jumping can only be regulated, if at all, as the use or operation of aircraft under subsection (1) of Section 2.17(a). That subsection purports to permit the use of "aircraft" without a permit in areas "designated by special regulations." § 2.17(a)(1). The defendants point out that one of the areas so designated is "[t]he entire surface of Lake Powell." 36 C.F.R. § 7.70(a)(6) (1995). Accordingly, the defendants assert that because the parachute used in BASE jumping can be deemed an "aircraft" and aircraft use is permitted on Lake Powell, they have not engaged in any prohibited conduct.

The Government, on the other hand, argues that BASE jumping parachutes should not be considered "aircraft" under the regulations. Although the Government conceded at oral argument that the parachutes allegedly used by the defendants may exhibit some of the characteristics of flight, *i.e.*, they can travel horizontally, (Transcript of Hearing on Motion to Dismiss, dated Sept. 9, 1996, at 49), it argues that the rulemaking history of Section 2.17 supports the view that parachutes of any kind do not fall within the meaning of "aircraft." Specifically, the Government relies on a statement that although the regulatory definition of aircraft was intended to expand the definition to include "ultralight aircraft and powerless flight," it was "not intended to include parachutes covered under subparagraph § 2.17(a)(3), or air delivery." 48 Fed.Reg. 30252, 30268 (June 30, 1983) (final rule).

Moreover, even if the parachutes used by the defendants could be viewed as "aircraft," the Government argues that subsection (3) still applies. The Government states that although Lake Powell has been designated as a landing area, the regulations provide that this designation is still subject to the restrictions found in Section 2.17.[4] Among these restrictions, is the subsection (3) prohibition against "delivering or retrieving a person or object by parachute, helicopter, or other airborne means." Thus, the Government argues that despite the designation of Lake Powell as a landing area, the delivery of a person "by parachute, helicopter, or other airborne means" requires a permit.

## ANALYSIS

■ At the outset, the Court begins its analysis by recognizing that due process requires a criminal statute to be stated in terms which are reasonably definite, so that a person of ordinary intelligence will know what the law prohibits or commands. *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). This requirement ensures that a defendant will receive adequate warning of what the law requires so that he or she may act lawfully, and it serves to prevent arbitrary and discriminatory enforcement by providing police, prosecutors, judges, and juries with clear guidelines to fairly administer the law. *Id.* at 357–58, 103 S.Ct. at 1858–59; *United States v. Gaudreau*, 860 F.2d 357, 363 (10th Cir.1988) (citations omitted). No person should be required, at peril of life, liberty, or property, to speculate as to whether their actions will subject them to criminal penalties. *Lanzetta v. New Jersey*, 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888 (1939). Accordingly, " 'penal statutes are to be construed strictly,' . . . and that one 'is not to be subjected to a penalty unless the words of the statute plainly impose it.' " *United States v. Campos–Serrano*, 404 U.S. 293, 297, 92 S.Ct. 471, 474, 30 L.Ed.2d 457 (1971) (citations omitted). It follows, therefore, that a criminal statute cannot be read expansively to include what is not plainly within its language, (*Kordel v. United States*, 335 U.S. 345, 348–49, 69 S.Ct. 106, 108–09, 93 L.Ed. 52 (1948); *United States v. Resnick*, 299 U.S. 207, 209–10, 57

---

4. Specifically, the regulations provide that the entire surface of Lake Powell is designated as an airstrip, "subject to the restrictions contained in § 2.17 of this chapter." 36 C.F.R. § 7.70(a)(6).

S.Ct. 126, 127, 81 L.Ed. 127 (1936)), or be extended by implication or analogy. *Williams v. Moore,* 262 F.2d 335, 338 (5th Cir.), *cert. denied,* 360 U.S. 911, 79 S.Ct. 1297, 3 L.Ed.2d 1261 (1959).

■ In determining the meaning of any statute or regulation the starting point must be the language of the statute itself, (*see Bailey v. United States,* 516 U.S. 137, ——, 116 S.Ct. 501, 506, 133 L.Ed.2d 472 (1995)), and the words used must be given their ordinary or natural meanings. *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979).

By its plain language, Section 2.17(a)(3) seeks to prohibit "delivering or retrieving a person or object by parachute, helicopter, or other airborne means." The ordinary meaning of the term "deliver" is to "set free from restraint" or to "give, transfer, yield possession or control." *Websters Third New International Dictionary of the English Language* 597 (1971). Rather than "yielding possession or control," BASE jumpers instead seek, and require, heightened control. As was amply demonstrated by the defendants at oral argument, BASE jumpers rely on the fact that the parachutes they use provide them with increased control. The shape of the parachutes, along with the controls and vents attached to some parachutes, provide a BASE jumper with control akin to horizontal flight that enables the jumper effectively to steer clear of the structure leapt from and to guide the parachute to a safe landing area. Thus, under the common meaning of delivery, it is difficult to understand how a person BASE jumping can be said to be "delivering" himself.[5]

■ More damaging to the Government's argument, however, is the regulation's inclusion of the phrase "other airborne means." If a person were to read the plain language of the regulation, they might understand that subsection (3) attempts to broadly prohibit the delivery or retrieval of a person or object by "parachute, helicopter, or other airborne means." Since what is meant by "other airborne means" is not defined by the regulations, the Court turns to its ordinary meaning for guidance. *See Perrin,* 444 U.S. at 42, 100 S.Ct. at 314. Websters defines "airborne" as "to be transported or designed to be transported by air." *Websters Third New International Dictionary* 45. To the average person, an airplane would be the quintessential means of "airborne" travel. Thus, according to its plain meaning, the average person would understand subsection (3) to prohibit the delivery of a person or object by parachute, helicopter, airplane, or any other device capable of human flight.

At the same time, however, subsection (1) of section 2.17(a) provides that the operation or use of aircraft is permitted in specially designated areas without a permit. Lake Powell is one of those areas. Thus, the average person reading subsection (1) would understand that he or she would be permitted to use an aircraft on Lake Powell. Aircraft, as noted by the defendants, is defined broadly to include any "device that is used or intended to be used for human flight in the air, including powerless flight." 36 C.F.R. § 1.4. 36 C.F.R. § 7.70(a)(6), however, also states that the use of aircraft on Lake Powell is subject to the restrictions found in Section 2.17, one of which is the restriction against delivery of a person or object by "airborne means." Thus, what the regulations seem to give with one hand, *i.e.,* the right to land an aircraft without a permit, they appear to take away with the other, *i.e.,* no delivery or retrieval of persons by "airborne means."

In response to this contradiction, the Government suggests that the phrase "other airborne means" was only intended to apply to some other airborne means of making air drops and not the normal use of aircraft and airplanes. Tr. at 47, 50–51. This interpretation, however, is contrary to the plain language of the regulations and is not supported in the scant rulemaking history. Nor is it

---

5. There also remains the question of whether a person already in the park can be said to be "delivering" himself to another location within the same park. A common understanding of "delivery" as used in the regulation appears to contemplate the delivery of a person or goods from *outside* the park to a location inside the park. It is far from clear that a person inside the park would consider their own movement from one location to another in the very same park as "delivery."

set forth anywhere in the regulations. Moreover, even if the Court were to adopt the Government's interpretation, the Information should be dismissed. If, as the Government submits, the phrase "other airborne means" applies only to "air drops," then it seems clear that the regulation as a whole was intended to apply only to air drops, whether by parachute, helicopter, or any other airborne means. Under this interpretation the regulation cannot be said to apply to parachuting that is not related to air drops—to parachute jumping from an aircraft.[6]

The regulations thus appear to put the average person in a difficult position. On the one hand, he is told that he may land his airplane on Lake Powell and "deliver" himself. On the other hand, in the same regulation, he is being told that he cannot deliver himself by any "airborne means." A person wishing to use an aircraft lawfully within the Lake Powell region is faced with a quandary as to making a choice as to what he is going to do, and, unfortunately, the regulations do not provide clear guidance as to what conduct is and is not permitted. A person should not be required to guess as to whether their course of conduct will subject him to criminal liability. *See Lanzetta*, 306 U.S. at 453, 59 S.Ct. at 619. As explained above, the plain reading of the regulations appears to both at once permit delivery by airborne means and prohibit delivery by airborne means. The regulation, in this context, is sufficiently fraught with ambiguity that one would find it difficult to understand what is allowed and what is prohibited.

■ At the very least, whether BASE jumping constitutes a violation under the regulation remains in doubt. In such cases,

the Court must adhere to the well-established rule that, " 'where there is ambiguity in a criminal statute, doubts are to be resolved in favor of the defendant.' " *Adamo Wrecking Co. v. United States*, 434 U.S. 275, 285, 98 S.Ct. 566, 572–73, 54 L.Ed.2d 538 (1978) (*quoting United States v. Bass*, 404 U.S. 336, 348, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971)). "This practice reflects not merely a convenient maxim of statutory construction. Rather, it is rooted in fundamental principles of due process which mandate that no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited." *Dunn v. United States*, 442 U.S. 100, 112, 99 S.Ct. 2190, 2197, 60 L.Ed.2d 743 (1979) (citations omitted). Accordingly, because the Court finds that the regulation as applied to the conduct of the defendants is ambiguous, the Information is hereby dismissed.

As a final point, the Court notes that the regulation the defendants were charged with violating came into existence pre-BASE jumping and that it appears to be a genuine strain to suggest that prohibition in subsection (3) goes beyond what would normally be thought of as "air drops." If the Park Service wants to prohibit BASE jumping, they could easily include a paragraph in the regulations and simply say BASE jumping is prohibited. If the regulation is intended to convey to the public a clear message of what conduct is and is not permitted in a national park, that purpose is not served by trying to shoehorn a prohibition against BASE jumping into a regulation that was promulgated with a different mischief in mind.

## CONCLUSION

By this Memorandum Opinion and Order, coupled with the Court's ruling from the

---

**6.** Although not conclusive, the early history of the regulations support this view. The proposed regulations state that "air delivery" may be permitted only after the park superintendent examines, among other things, the "availability of ground transport facilities as an alternative method of delivery." 30 Fed.Reg. 1857 (proposed Feb. 9, 1965). The inclusion of an examination of other alternative ground delivery methods clearly indicates that what was contemplated by air delivery was the traditional notion of air drops of cargo or persons. What the regulation sought to prohibit is the air drop of such goods without a permit. Thus, it does not appear that

the regulation, as originally proposed, was intended to govern the type of activity charged here.

In addition, the regulations have also adopted the Federal Aviation Administration ("FAA") regulations. 36 C.F.R. § 2.17(d). In its regulations, the FAA provides that the only type of parachute jumping it seeks to regulate is the "descent of a person, to the surface from an aircraft in flight." 14 C.F.R. § 105.1(b) (1996). Similarly, it does not appear that this regulation was intended to govern the purported activities of the defendants. *See* 14 C.F.R. § 105.11.

bench on September 9, 1996, the Court hereby grants each of the defendants' Motions to Dismiss.

**IT IS ORDERED** that each defendant's Motion is granted and the further remaining counts, namely as against William Oxx counts one and ten; Jonathan Oxx count two; Martin Tilly count three; Christopher Berke count four; David Katz count five; Steve Mulholland count seven; John M. Henderson count eight; Aaron M. Brennan count nine: and Michael Kvale count ten, are hereby **DISMISSED.**