UNITED STATES of America,
Plaintiff,

v.

William OXX, Jonathan Oxx, Martin Tilly, Christopher Berke, David Katz, Steve Mulholland, John M. Henderson, Aaron M. Brennan, and Michael Kvale, Defendants.

No. 2:96–CR–77 J.

United States District Court,
D. Utah,
Central Division.

July 15, 1999.

Mark Y. Hirata, Assistant United States Attorney, Salt Lake City, UT, for Plaintiff.

Fred Morelli, Aurora, IL, for Defendants.

## MEMORANDUM OPINION AND DECISION

JENKINS, Senior District Judge.

### Background

On April 18, 1996, the United States filed a petty offense Information charging each of the named defendants in separate counts as to each but joined for convenience with violating 36 C.F.R. § 2.17(a)(3) (1995) by "deliver[ing] persons by para-

chute within the Glen Canyon National Recreation Area without a permit and when not required by an emergency." Investigations by the National Park Service resulted in warrants issued for each defendant. A joint bench trial for all of the defendants was scheduled for September 12, 1996. At the time of pre-trial motion hearings, the Government asserted that during the week of April 28, 1995, through May 3, 1995, each of the named defendants engaged in the activity commonly known as BASE [1] jumping by leaping off the cliffs of Glen Canyon National Recreation Area and then, shortly after leaping, deploying a parachute or similar device to glide to a landing on Lake Powell.

On August 29, 1996, the defendants filed a joint Motion to Dismiss the counts pending against them, asserting, among other things, that the Information was defective. The defendants contended that the Information should be dismissed because section 2.17(a)(3) of the Park Service regulations does not clearly prohibit BASE jumping, and, as applied to the facts of this case, section 2.17(a)(3) is ambiguous.

After hearing argument, considering proffered facts and testimony, and reviewing the papers submitted on the motion, the court found that the regulations were not intended to prohibit BASE jumping. The court also concluded that the regulation, as applied to the purported conduct of the defendants, suffered from an incurable ambiguity. The court then dismissed the Information as to each defendant. *See United States v. Oxx*, 980 F.Supp. 405, 408–09 (D.Utah 1997).

The Government appealed and the Court of Appeals for the Tenth Circuit reversed. *See United States v. Oxx*, 127 F.3d 1277 (10th Cir.1997). In doing so, the Tenth Circuit held that the defendants

1. BASE is an acronym describing the structures—Buildings, Antennae, Spans, and Earth forms—that devotees of this activity commonly leap from. An activity that is akin to hang gliding, the sport of BASE jumping calls for the base jumper to first leap from a stationary structure of his or her choice and, after enjoying a brief free-fall, to then deploy a parachute enabling the jumper to land safely. A person who completes a jump off each of the four structures can be certified as a BASE jumper.

unambiguously used a "parachute" as that term is defined under the regulations. *See id.* at 1279. The court also concluded that section 2.17(a)(3) was not ambiguous when applied to the defendants' BASE jumping activities because delivery by "parachute" was clearly prohibited.

Following reversal, this court held extensive pretrial hearings concerning the defendants' motion to suppress and motion to dismiss on pre-emption grounds. Both motions were denied. A bench trial was then held on October 6 and 7, 1999. At the trial's conclusion, and for reasons stated on the record, the court found defendants John M. Henderson and Michael Kvale not guilty of the petty offense charged, respectively, in Counts 8 and 10 of the Information.[2] As to the remaining defendants, the court reserved its decision. Now, for reasons stated below, the court finds defendants William Oxx, Jonathan Oxx, Martin Tilly, Christopher Berke, David Katz and Aaron M. Brennan not guilty of the petty offenses charged in the Information.

## Discussion

The defendants have been charged with violating 36 C.F.R. § 2.17(a)(3), which reads in part:

(a) The following are prohibited:

(1) Operating or using aircraft on lands or waters other than at locations designated pursuant to special regulations.

\* \* \* \* \* \*

(3) Delivering or retrieving a person or object by parachute, helicopter, or other airborne means, except in emergencies involving public safety or serious

property loss, or pursuant to the terms and conditions of a permit.

36 C.F.R. § 2.17(a)(3) (1995). In part, the defendants assert that their alleged conduct does not violate this regulation because BASE jumping cannot be considered as "delivering ... a person by parachute," within the meaning of section 2.17(a)(3). Although BASE jumping does involve the use of a parachute, the defendants contend that the types of parachutes used in BASE jumping, and the type of parachutes they allegedly used, permit the jumper to control the parachute and engage in horizontal flight. The defendants argue that this element of flight control makes BASE jumping similar to hang gliding and other forms of powerless flight, and distinguishes the parachutes or "airfoils" allegedly used by the defendants from the parachutes prohibited under the regulations.

The United States, on the other hand, argues that the Tenth Circuit has already answered, in the affirmative, the question of whether BASE jumping parachutes are "parachutes" under section 2.17(a)(3). Thus, so long as the United States demonstrates, beyond a reasonable doubt, that each defendant, without a permit, used a parachute to deliver himself to a place within the Glen Canyon National Recreation Area, then each defendant is guilty of violating section 2.17(a)(3).[3]

## Analysis

■ At the outset the court begins its analysis by commenting on the question of whether the devices the defendants used in BASE jumping are "parachutes" as that term is understood under section 2.17(a)(3).

---

**2.** At the opening of the trial, the court was informed that defendant Steve Mulholland was killed in a sky-diving accident in Antarctica. The accident occurred on December 6, 1997, and took the lives of Mr. Mulholland and two companions. The United States then moved to dismiss the Information as to Mr. Mulholland. The court granted the motion.

**3.** Most of the conduct charged in the Information allegedly occurred between April 28 and May 3, 1995, at Lake Powell in the Glen Canyon National Recreation Area. However, in Count 10, William Oxx (who was also charged in Count 1) and Michael Kvale were separately charged with violating section 2.17(a)(3) for conduct that allegedly occurred within the boundaries of Canyonlands National Park on or about November 15, 1994.

The United States is correct when it argues that the Tenth Circuit's decision in *United States v. Oxx* resolves this issue. There, the Court of Appeals concluded that because these devices " 'retard the fall of a body or object through the air' " they are unambiguously "parachutes" as that term is used in section 2.17(a)(3). *Oxx*, 127 F.3d at 1279 (quoting 14 C.F.R. § 1.1). Therefore, despite the uncontroverted evidence now offered by the defendants that the devices they used were capable of extended flight and control—a control that makes these devices more like powered aircraft than simple parachutes—this court is bound to apply the dictates of the Tenth Circuit when it says, in summary, a parachute is a parachute is a parachute.

In all fairness, however, the defendants actual use of these devices suggests that, in this narrow factual circumstance, the Court of Appeals may not have been so far off the mark as alleged by defendants. According to the evidence presented to the court, the more experienced BASE jumpers among the defendants would run to the edge of the cliff and leap off. These jumpers would not immediately deploy their parachutes. Instead, they enjoyed an extended "free-fall" for as long as possible, only deploying their parachute when the prospect of meeting the Earth with the full force of gravity overcame the thrill of free-fall. The less-experienced BASE jumping defendants would also leap off the cliff, but instead of waiting to deploy their parachutes they would immediately deploy their chutes as soon as they began their free-fall. In each instance, it appears that the oft-talked about "rush" one "enjoys" from BASE jumping comes from a combination of the thrill of the free-fall and the danger of the activity. Thus it appears that it is the jump and free-fall, rather than the descent and glide under a parachute, that gives BASE jumping its special appeal.[4]

Moreover, given the limited time it took to complete these BASE jumps, and the relative short heights from which these BASE jumps were made, any flight attributes the parachutes or airfoils may have are, for the most part, secondary to the role the parachutes plays in controlling the jumper's descent and avoiding a gravity-induced re-acquaintance with *terra firma*. In such a circumstance, the Tenth Circuit's conclusion that the devices used by the defendants are "parachutes," because they were intended to retard the fall of the defendants' bodies through the air, is a fair one.

The conclusion that the devices the defendants allegedly used were parachutes as that term is understood under section 2.17(a) (3), however, does not alone demonstrate their guilt. As mentioned previously, the defendants are charged with violating 36 C.F.R. § 2.17(a)(3), which, in relevant part, makes it unlawful to deliver or retrieve a person or object by parachute, *"except* in emergencies involving public safety or serious property loss, or *pursuant to the terms and conditions of a permit."* (emphasis added). Counts 1 through 9 of the Information charge the defendants with "deliver[ing] persons by

---

4. The court also recognizes that some BASE jumpers may be attracted to the sport because of the location of the jumps. For example, BASE jumpers have jumped off New York's World Trade Center and Empire State Building, Seattle's Space Needle (a feat accomplished by defendant Steve Mulholland before his death), the Arch in St. Louis, and other objects of similar import. Often these events are clandestine affairs, planned to avoid detection by the authorities. But for reasons known only to its devotees, these clandestine jumps are meticulously videotaped. The videotapes are then shared with others. As this case amply demonstrates, such sharing can lead to trouble. Indeed, it is likely that none of the defendants would have been charged if defendant William Oxx did not willingly send a videotape of his Canyonlands BASE jump to the Park Service Ranger who was investigating such activities. The videotape not only clearly identified Oxx, but in conversations relating to the tape, Oxx informed the ranger that he would be BASE jumping at Lake Powell later in the year, information that lead to the present charges. Hubris claims another victim.

parachute within the Glen Canyon National Recreation Area (Utah side) *without permit and when not required by emergency.*" (Petty Offense Information, file dkt. no. 1.) (emphasis added).[5]

A close reading of the regulation and the charge in the Information makes the following clear: in order to violate section 2.17(a)(3), as charged in this case, a person must deliver him or herself by a parachute without a permit or the existence of an emergency. *See* 36 C.F.R. § 2.17(a)(3). The United States apparently agrees with this construction. In its opening statement it emphasized that by the close of evidence "it will prove and establish beyond a reasonable doubt Your Honor that these named defendants ... delivered themselves by parachute within the Glen Canyon National Recreation area and they did so *without a permit and not in an emergency situation* all in violation of 36 C.F.R. Section 2.17 Sub. a., Sub 3." (Tr. vol. I, at 5.) (emphasis added). Thus, as understood by the court and the United States, there are three elements to the section 2.17(a)(3) offense charged in this case: (1) delivery; (2) by parachute; (3) and without a permit or some emergency situation.

■ Under our Constitution the Fifth Amendment requires, and all parties here would acknowledge, that the United States bears the burden of proving beyond a reasonable doubt that the defendant is guilty of all the elements of a crime. U.S. CONST. amend. V.; *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). It is without dispute that a criminal conviction must rest on a determination that the defendant "is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *United States v. Gaudin*, 515 U.S. 506, 510, 115 S.Ct. 2310, 132 L.Ed.2d 444

(1995). The burden on the United States to prove a defendant's guilt beyond a reasonable doubt cannot be relieved by a defendant's decision not to contest an essential element of the crime. *See Estelle v. McGuire*, 502 U.S. 62, 69, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Nor may the United States shift the burden to the defendant to try and disprove an essential element. *See Mullaney v. Wilbur*, 421 U.S. 684, 703–04, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975).

■ After listening to the testimony and carefully reviewing the trial transcript, the court finds that the United States has failed to establish an element of a section 2.17(a)(3) offense. Nowhere in the exhibits offered and received or in the testimony given has the United States established that the defendants delivered themselves by parachute *without a permit*. Although three agents for the National Park Service testified at trial, none testified about the absence of a permit. Nor was there any other evidence, direct or circumstantial, that established the nonexistence of a permit.

There are only three reported cases that discuss the application of section 2.17(a)(3), two of which arose out of this very case. *See United States v. Oxx*, 127 F.3d 1277 (10th Cir.1997), rev'g 980 F.Supp. 405 (D.Utah 1997); *United States v. Carroll*, 813 F.Supp. 698 (E.D.Mo.1993). Only one of these cases, *United States v. Carroll*, discussed the evidence necessary to establish a section 2.17(a)(3) offense.

In *Carroll*, the defendant was charged in Count 1 with conspiring and aiding and abetting a conspiracy to violate of 36 C.F.R. § 2.17(a)(3). Apparently the defendant got caught up in the BASE jumping escapades of a recent acquaintance. De-

**5.** Count 10 of the Information, which charges Will Oxx and Michael Kvale with violating section 2.17(a)(3) on another occasion and in a different location, differs only slightly. It reads in part that "the defendants herein, did deliver persons and objects by parachute and did aid and abet such delivery within the outer boundaries of the Canyonlands National Park, *without permit and when not required by emergency;* all in violation of 36 C.F.R. § 2.17(a)(3)." (File dkt. no. 1) (emphasis added).

spite the shortness of their acquaintance, the defendant agreed to videotape and otherwise aid the daring exploits of his new-found friend as he first climbed and then leapt from the top of the stainless steel "St. Louis Arch," located in Jefferson National Expansion Memorial. To aid in this endeavor, the defendant was in direct radio contact with his BASE jumping buddy. After watching his friend climb to the top of the Arch, the defendant moved some equipment to a waiting escape car and waited for further instruction. As dawn broke, the defendant was instructed to begin videotaping. Soon thereafter, his friend leapt from the Arch and after a brief free-fall deployed a parachute and landed safely. The defendant videotaped the entire jump. Unfortunately, a Park Ranger witnessed the jump and began chasing the defendant. The defendant was caught, but his BASE jumping friend made a clean getaway. *See Carroll,* 813 F.Supp. at 700–02.

In finding the defendant guilty of Count 1, the court recited the facts that it found were established beyond a reasonable doubt. Among these facts, and the very last fact the court found, was that neither the defendant nor the BASE jumper "had applied for or received an appropriate permit, permission, or authorization either to climb the Arch, to jump from it, or to photograph the jump." *Id.* at 702. In its analysis, the court noted the absence of such permission: "Section 2.17(a)(3) proscribes the delivery of a person or an object by parachute without a permit. The evidence is undisputed that no permit or other authorization was granted for the climb or the parachute jump." *Id.* at 703.

Thus, as its findings and analysis make clear, the *Carroll* court understood that in order to find the defendant guilty under section 2.17(a)(3), the United States was required to establish beyond a reasonable doubt that the defendant did not have a permit to deliver himself by parachute. *Cf. United States v. Vuitch,* 402 U.S. 62, 70, 91 S.Ct. 1294, 28 L.Ed.2d 601 (1971)

(noting that "when an exception is incorporated into the enacting clause of a statute, the burden is on the prosecution to plead and prove that the defendant is not within the exception").

In a case involving analogous regulatory language, the District of Montana understood a regulation that contained similar "except in" language as requiring the United States to establish that the defendant lacked the necessary permit. In *United States v. Little,* 638 F.Supp. 337 (D.Mont. 1986), the defendant was charged with violating 36 C.F.R. §§ 261.6(a) and (h), a regulation that prohibits the cutting or removing of any timber or tree, "except as authorized by a special-use authorization, timber sale contract, or Federal law or regulation." In finding the defendant guilty of this offense, the court noted that the uncontroverted evidence presented at trial established that the defendant "cut and removed firewood . . . . [and that] [d]efendant did not possess the required permit for such activity." *Id.* at 338.

The New Jersey Supreme Court has also concluded that proof of a permit (or lack thereof) in an offense that prohibits certain conduct without first having obtained a permit is an essential element of the offense. In *State v. Ingram,* 98 N.J. 489, 488 A.2d 545 (1985), the court was called upon to construe a criminal statute that made it a crime for any person to knowingly have in his possession any handgun " 'without first having obtained a permit to carry the same.' " *Id.* at 546 (quoting N.J.S.A. 2C:39–5b). Although the court relied on provisions of New Jersey's statutory law to make its determination, some of its analysis is helpful here. For example, the court noted that elements of a criminal offense are the instances of conduct or attendant circumstances that are included in the description of the forbidden conduct in the statute or regulation defining the offense, or conduct or circumstances that negate an excuse or justification for such conduct. *Id.* at 547. The court noted that the lack of a handgun

permit fits both these categories. First, it falls within the description of the offense and, second, it negates a justification for the offense. Thus, the court concluded that the absence of a permit was an essential element of the offense. *Id.* at 547.

The same is true for an offense under 36 C.F.R. § 2.17(a)(3). The regulation prohibits delivery of a person or object by a parachute "except . . . pursuant to the terms and conditions of a permit." The Information charged the defendant with delivering themselves "without a permit." It is clear that the lack of a permit falls within the description of the forbidden conduct. It is equally clear that the absence of a permit would also negate a justification for the offense. Thus, it appears that the lack of a permit is a necessary element of a section 2.17(a)(3) offense.

Additional guidance in determining if an exception is an element of an offense that must be pled and proven by the United States is found in *United States v. Durrani*, 835 F.2d 410 (2d Cir.1987). In *Durrani*, the court looked to the following three factors in determining whether an exception was an affirmative defense or an element: (1) the legislative history of the statute; (2) the text of the statute; and (3) the parties relative abilities to present evidence on the issue. *See id.* at 420.

█ In the present case, although the legislative history of the regulation is sparse, it does indicate that air delivery by parachute was only prohibited "unless a permit has been issued." 48 Fed.Reg. 56974 (Dec. 27, 1983); 49 Fed.Reg. 18448 (Apr. 30, 1984) ("The section prohibits air delivery of persons or objects, unless a permit has been issued."); *see also* 30 Fed.Reg. 1857 (proposed Feb. 9, 1965, to be codified at 36 C.F.R. § 1.61(b)) (" . . . no person or thing may be air delivered in the parks and monuments by parachute, helicopter, or other means without written permission of the superintendent."). Indeed, at the time the regulation was initially adopted, John Carver, Under Secretary of the Interior, described the regulation as

only containing an exception for "extreme emergencies" and only prohibiting air delivery that was "without written permission." 30 Fed.Reg. 1857. In fact, the major portion of the legislative history does not discuss the prohibition on air delivery, but rather discusses the process for issuing a permit. *See* 48 Fed.Reg. 18448; 48 Fed.Reg. 56974, 56975; *and* 30 Fed.Reg. 1857 (each noting the authorization process by which a Park Superintendent may permit air delivery or powerless flight).

As to the parties' relative ability to present evidence of the existence of a permit, the court finds that the United States, as the issuer of the permit, would be in the best position to demonstrate the non-existence of such authorization. This could have easily been demonstrated by having the Park Superintendent or some other official person testify that no permits for BASE jumping had been issued to any of the defendants.

Although the text of the regulation, in its current form, places the permit question within a clause that discusses exceptions from the prohibition, the first two factors weigh heavily in favor of placing the burden of demonstrating the absence of a permit on the United States. Therefore, the court finds that the absence of a permit to be an element of an 36 C.F.R. § 2.17(a)(3) offense. This conclusion, as noted above, is buttressed by the United States' inclusion in both the charging document and in its opening statement that the absence of a permit was an element that it needed to prove beyond a reasonable doubt.

In the present case, the United States has failed completely to offer any evidence whatsoever on the issue of whether the defendants had a permit to deliver themselves by parachute. Because the absence of a permit is an element of the offense charged (the regulation excepts persons who act pursuant to a permit, the Information obtained in this case expressly

charged the defendants with acting "without permit," and the United States asserted that it would prove beyond a reasonable doubt that the defendants acted "without a permit"), the United States' failure to establish this element mandates acquittal.

Of course this case is different from a case where an essential element contained in the charging document and otherwise proven at trial was not included in a jury instruction. *See Neder v. United States,* ── U.S. ──, ──── ────, 119 S.Ct. 1827, 1837–39, 144 L.Ed.2d 35 (1999); *Johnson v. United States,* 520 U.S. 461, 464, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997). In such cases, there is generally no dispute that evidence was presented on the essential element, but rather the dispute centers on whether there was a jury finding on that element. *See Neder,* ── U.S. at ──── ────, 119 S.Ct. at 1837–39; *Johnson,* 520 U.S. at 468–70, 117 S.Ct. 1544.

This case is also different from the many cases, including cases from this circuit, that have concluded that the United States is not required to negate exceptions that are not considered elements of the offense unless the defendant first presents evidence to bring himself within the exception. *See Tritt v. United States,* 421 F.2d 928, 929–30 (10th Cir.1970); *7 Fifths Old Grand–Dad Whiskey v. United States,* 158 F.2d 34, 36 (10th Cir.1946); *Edwards v. United States,* 113 F.2d 286, 289 (10th Cir.1940), *rev'd on other grounds,* 312 U.S. 473, 61 S.Ct. 669, 85 L.Ed. 957 (1941); *Nicoli v. Briggs,* 83 F.2d 375, 379 (10th Cir.1936); *see also McKelvey v. United States,* 260 U.S. 353, 357, 43 S.Ct. 132, 67 L.Ed. 301 (1922) (noting that the "settled rule" is that an indictment "founded on a general provision defining the elements of an offense . . . need not negative the matter of an exception made by proviso or other distinct clause, . . . and that it is incumbent on one who relies on such an exception to set it up and establish it").

Unlike these cases, in this case, as previously noted, the United States considered the absence of a permit to be an element of the offense charged: the lack of a permit was expressly contained in the charging document and was discussed by the United States as part of its burden of proof. In fact, in a similar section 2.17(a)(3) prosecution before another judge of this court, the United States proffered testimony as to the absence of a permit. (*See United States v. Gravity Sports, et al.,* 2:96–CR–52A). Importantly, and in contrast to the above mentioned cases, the only other reported case to have dealt with a section 2.17(a)(3) offense considered the absence of a permit to be an essential element. *See Carroll,* 813 F.Supp. at 702–03.

Thus, the analysis is very different when, as here, the United States has completely failed to offer any evidence on an element of a crime. In such a situation the jury (in this case the court) is called upon to speculate or assume that, despite the total absence of evidence on the issue, an essential element has been proven beyond a reasonable doubt. It should be clear to all that such speculation is impermissible.

The court recognizes that the question of the makeup of the roster of the elements of the alleged offense is a close one. The elements and the burden, as defined in this case by the United States, are reasonable and compatible with the presumption of innocence. That burden, on this record, has not been met. As Sir William Blackstone has noted, ". . . all presumptive evidence of felony should be admitted cautiously: for the law holds, that it is better that ten guilty persons escape, than that one innocent suffer." 4 William Blackstone, *Commentaries on the Laws of England* \*352 (1769). As to whether such a result is fair, Blackstone offers additional sage counsel: "[Y]et let it be again remembered, that delays, and little inconveniences in the forms of justice, are the price that all free nations must pay for their liberty in more substantial matters." *Id.* at \*344.

**1222**

## Conclusion

For the reasons set forth above and for reasons stated by the court on October 7, 1998, the court finds the defendants, William Oxx (Counts 1 and 10), Jonathan Oxx (Count 2), Martin Tilly (Count 3), Christopher Berke (Count 4), David Katz (Count 5), John M. Henderson (Count 8), Aaron M. Brennan (Count 9), and Michael Kvale (Count 10), NOT GUILTY of the offenses charged in the Information. The charges against Steve Mulholland (Count 7) are DISMISSED.